[Crim. No. 13072.   Second Dist., Div. Five.   Apr. 10, 1968.]

THE PEOPLE, Plaintiff and Respondent, v. JACK ROSS VALDEZ, Defendant and Appellant.

Jean Clare Keister, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, George J. Roth and Philippe J. Monet, Deputy Attorneys General, for Plaintiff and Respondent.

KAUS, P. J.—Defendant appeals from an order committing him to the California Rehabilitation Center at Corona, as a result of a determination by the trial court, pursuant to section 3106 of the Welfare and Institutions Code, that he is a narcotic addict.

Defendant's apprehension by the authorities came about as follows. Shortly after noon, on August 11, 1966, Officers Olson and Evans of the Los Angeles Police Department, Narcotics Division, were conducting an investigation of Raul Guevarra and Eddie Nelson in connection with addiction and a burglary. Their investigation took them to a motel at 1750 Colorado Boulevard in Los Angeles. They went to the manager's office and inquired about Nelson and Guevarra. The manager told the officers the two men lived there, but that Guevarra was not in at the time. The officers went to the motel room and knocked on the door. Defendant pulled the drape aside and looked out the window. Officer Olson identified himself and

said he wanted to talk to "Eddie." Defendant disappeared from view. Olson heard some walking around inside. The door opened about two minutes later and Guevarra was standing there. Olson stated to him, "I want to talk to you, Raul." Guevarra stepped back from the doorway and the officers entered. They had a short conversation with Guevarra. Nelson then came out of the bathroom and they talked with him. Both Nelson and Guevarra had numerous puncture marks and old scar tissue on their arms. The officers had information that they used narcotics. Guevarra and Nelson were placed under arrest for narcotics violations.

Defendant, meanwhile, was seated on one of the two beds in the room. He was wearing a T-shirt and had picked up another shirt. Officer Olson approached him and asked his name. Defendant replied, "Valdez." The room was in semi-darkness. The drapes were drawn; the only light came from a television set which was on. Officer Olson noticed defendant's pupils were contracted. By contrast the pupils of the other occupants of the room appeared normal. Olson glanced down at defendant's arms and noticed "discolored tissue over the inner portions of both arms, inner elbow." Olson then picked up defendant's arms and examined them closely. He observed several scabs, a puncture mark and a bad burn on one finger. He concluded that the scabs and puncture wound had been caused by injection of narcotics and that defendant was then under the influence of narcotics. He placed defendant under arrest for violation of section 11500 of the Health and Safety Code.

On August 15, 1966, the district attorney, pursuant to section 3100 of the Welfare and Institutions Code, filed a petition for commitment of defendant as a narcotics addict. The petition was accompanied by the affidavit of Doctor Patrick J. Lavelle, the physician who had examined defendant at the county jail infirmary on the morning of August 12, 1966. The affidavit, executed on the morning of August 15, 1966, stated: "From the fact that patient presented with [sic] symptoms of narcotic withdrawal when seen by this examiner and verified by the nurses observations over past 72 hours; from the evidence of old tracks and recent puncture wounds as noted in the schematic, it is this examiner's opinion that this patient is an actual narcotic addict. Patient has repeatedly refused to give urine specimen."

Also accompanying the petition for commitment was an "application for admission of alleged narcotic addict" which

had been executed by Officer Olson, on August 11, 1966, pursuant to section 3100.6 of the Welfare and Institutions. Code. This application bore a notation by Officer Olson that defendant was given a copy of the document. An order of detention was issued by the superior court on August 15, 1966, and served on defendant the same day. (Welf. & Inst. Code, § 3102.)

On August 17, 1966, defendant appeared in court. The public defender was appointed to represent him. Defendant was informed of the nature of the proceedings and of his rights. August 23, 1966, was set for hearing on the petition.

On August 23, 1966, defendant appeared in court with retained counsel who was thereupon substituted in for the public defender. The hearing was then continued to September 6, 1966.

On September 6, 1966, a hearing was held at which Officer Olson testified to the events which led to defendant's arrest. At the conclusion of Olson's testimony, defense counsel's motion to dismiss on the grounds that the officers had not had probable cause to arrest defendant or to examine his arms was denied. Defendant was ordered committed to the Director of Corrections for placement in the California Rehabilitation Center. Defendant then requested a jury trial, which was set for September 15, 1966. After defendant waived jury trial, trial to the court was held on October 10, 1966. Doctor Lavelle testified for the People. Defendant testified in his own behalf. The court found that the allegations of the petition were sustained and that defendant was a narcotic addict. Defendant was committed to the Director of Corrections in accordance with the earlier commitment of September 6, 1966.

Defendant asserts, essentially, four grounds of appeal:

1. That his commitment resulted from an illegal search and seizure of his person, the results of which must, constitutionally, be excluded from the commitment proceedings; 2. that the evidence of addiction presented by the People was insufficient, as a matter of law, to sustain the finding of addiction; 3. that the trial court applied an erroneous burden of proof in reaching its decision; and 4. that defendant's *Miranda* rights were violated.

*Search and Seizure.*

We find that the conduct of the arresting officers did not constitute an illegal search or seizure. We therefore do not reach the question of whether the exclusionary rule (*Mapp* v. *Ohio,* 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933]) applies in a civil narcotic commitment proceeding. (Cf.

*People* v. *Gonzales,* 256 Cal.App.2d 50, 53-56 [63 Cal.Rptr. 581].)

Defendant does not contend that the arrest of his companions was illegal, nor does he claim that the arresting officers' presence in the motel room was unlawful. He complains, however, that his mere presence in the motel room in company with others who had committed narcotics violations was insufficient to justify his arrest and that the "seizure" and examination of his arms were therefore impermissible.

The initial fallacy of defendant's argument is his premise that the officers based his arrest on either his mere presence in the room or on the results of picking up his arm. ■ As was pointed out in *People* v. *Ramirez,* 185 Cal.App.2d 301, 306 [8 Cal.Rptr. 184] : "It is, of course, clear that the mere fact that a person is on premises where officers have reason to believe there are narcotics will not justify either his arrest or a search of his person. (*People* v. *Boyd,* 173 Cal.App.2d 537, 539 [343 P.2d 283] ; *People* v. *Green,* 152 Cal.App.2d 886, 889 [313 P.2d 955].) **[1b]** But in the present case there was more than mere presence or association." There were the additional factors of the discolored tissue on defendant's arms and the apparently abnormal contraction of the pupils of defendant's eyes, when, as we know, in a semi-darkened room the pupils normally tend to dilate. Both these phenomena were in plain view of Officer Olson and observed without any semblance of a search or seizure. We believe these facts, taken together with the officers' knowledge of narcotics activities by his companions, gave the officers probable cause to arrest defendant even before the closer examination of his arm which revealed the scab and puncture wound. (*People* v. *Johnson,* 155 Cal.App.2d 369, 372 [317 P.2d 1000] ; *People* v. *Rodriguez,* 140 Cal.App.2d 865, 867 [296 P.2d 38].) If probable cause for the arrest existed prior to the seizing of defendant's arm, that "search and seizure" was not unlawful merely because it preceded, rather than followed the arrest. (*People* v. *Cockrell,* 63 Cal.2d 659, 666-667 [47 Cal.Rptr. 788, 408 P.2d 116].)

### Sufficiency of Evidence.

The elements of narcotic addiction have been set forth in *People* v. *Victor,* 62 Cal.2d 280, 302 [42 Cal.Rptr. 199, 398 P.2d 391]. ■ In the present proceeding testimony was adduced from Doctor Lavelle relevant to each of the essential aspects of addiction set forth in *Victor*—emotional dependence, tolerance, and physical dependence.

With respect to evidence of physical dependence he testified that the puncture wounds on defendant's arm were caused by injection of narcotics. He further testified as follows: "Q. Doctor, did you notice any evidence of narcotic withdrawal? A. Yes, I did. Q. What was that, Doctor? A. The symptoms of a pale, profusely perspiring skin, with increased nasal drip, watery secretion from the mouth. It was this examiner's opinion that this patient is a narcotic user of old and recent date, in that he is in mild stage of narcotic withdrawal at this time."

When asked if he found any evidence of tolerance to narcotics, Lavelle stated "Only by inference." An attempt by the People to have Lavelle explain what he meant by "inference" was blocked by a defense objection.

In response to the People's inquiry as to any evidence of emotional dependence on narcotics, Lavelle testified: "A. From the fact that the patient had old tracks and recent puncture wounds, that would indicate that he was using narcotics again and again, and in my estimation this indicates emotional dependence on narcotics."

When asked about the length of time it would take to establish tracks such as those found on defendant's arms Lavelle replied: "A. . . . Certainly with the track this patient had, I would say that it was a matter of years rather than months, weeks or days. Years, how many I don't know. Q. You feel that use of narcotics has been going on for some time? A. Years. I don't know how many years. Q. Based upon these facts did you form an opinion as to whether or not the respondent is a narcotic addict? A. Yes, I did. Q. What is that opinion? A. That he was a narcotic addict, and at the time I examined him he was in the stages of mild narcotic withdrawal."

No other medical witnesses were presented. The only real attempt to impeach Doctor Lavelle's conclusions involved an effort to demonstrate that the defendant's appetite was good during his detention whereas, according to Lavelle's testimony, the appetite of a person experiencing withdrawal would be bad. On redirect examination Lavelle was asked: "Q. The fact that he did eat well on two occasions on the 12th, would this tend to make you change your opinion as to your diagnosis? A. No."

Thus the medical testimony quoted above stands unretracted. The qualifications of Doctor Lavelle as an expert in the field are not questioned. Although the evidence with respect to emotional dependence and tolerance is somewhat

skimpy, as we pointed out in *People* v. *Duncan,* 255 Cal.App. 2d 75, 78 [62 Cal.Rptr. 822]: "The court's reference to emotional dependence and tolerance is a description of stages in the process which ultimately result in addiction. If the person who has been taking drugs has reached the stage of suffering withdrawal sickness when drugs are discontinued, he has already passed the points of emotional dependence and tolerance. The withdrawal sickness is the unmistakable signal that the user is addicted."

## Burden of Proof

■ The question whether or not the trial court applied the correct burden of proof is not raised as a separate point on appeal, but as part of the argument that the evidence does not sustain the finding of addiction.[1] Nevertheless we think that the point is legitimately before us, particularly since it is evident from the record that the trial court would not have committed defendant had it felt that the People were required to prove their case beyond a reasonable doubt.[2]

We think that the trial court applied the standard prescribed by the Legislature and that such standard meets the requirements of due process and equal protection.

■ As far as the intent of the Legislature is concerned it is, to be sure, rather hard to find. The hearing in the instant case took place on October 10, 1966. At that time section 3108 of the Welfare and Institutions Code had been added to that code by chapter 1226 of the 1965 statutes, effective September 17, 1965. Section 3108 prescribed that the jury trial be held "in substantial compliance with the provisions of Section 5125 of this code." Unfortunately, an urgency measure (Stats. 1965, ch. 391), effective May 25, 1965, reenacted section 5125 as section 5572 of the Welfare and Institutions

---

[1] "It is urged that the amount of evidence required in a quasi-criminal' matter, such as in this commitment proceeding, is the same as a criminal case, i.e. proof beyond a reasonable doubt. Appellant is facing the loss of his liberty and freedom. Therefore, the quantum of proof necessary to sustain a commitment order should be greater than in a civil case. In a commitment proceeding the opposing party is the State and the consequences are certainly far more serious than where the judgment is merely for money damages. It is only just and reasonable to require a greater degree of persuasion by the trier in the truth of the charge in a quasi-criminal case than in a civil case. For this reason the burden of proof against the defendant in a 'quasi-criminal' case should be greater than the requirement in a civil case, i.e. by a preponderance of the evidence."

[2] "It would be my hope in these cases that the People in presenting their evidence might go beyond what they have, but the burden here is by preponderance. The Court feels that that burden has been sustained."

Code.[3] The Supreme Court has already determined that the erroneous reference to section 5125 should be interpreted as a reference to section 5572. (*People* v. *Bruce,* 64 Cal.2d 55, 59, fn. 4 [48 Cal.Rptr. 719, 409 P.2d 943].) Section 5572, itself, does not provide for a particular burden of proof, but section 5575, part of the same article in the code provides, inter alia: "The trial shall be had as provided by law for the trial of civil causes, and if tried before a jury the person shall be discharged unless a verdict that he is mentally ill is found by at least three-fourths of the jury." While there is no specific designation of the burden of proof in the above language, we think it fairly clear that it refers to what is, with some exceptions (Witkin, Cal. Evidence (2d ed. 1966) §§ 209-210), the customary burden of proof in civil cases: preponderance of the evidence.

█. Turning to due process, we may assume that in criminal cases it is part of the due process guaranteed by the Fourteenth Amendment that guilt must be established beyond a reasonable doubt.[4]

*In re De La O,* 59 Cal.2d 128, 136-150 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705], several other Supreme Court decisions (e.g. *People* v. *Victor,* 62 Cal.2d 280, 292 [42 Cal. Rptr. 199, 398 P.2d 391]; *People* v. *Ortiz,* 61 Cal.2d 249, 255 [37 Cal.Rptr. 891, 391 P.2d 163]; *In re Trummer,* 60 Cal.2d 658, 662-665 [36 Cal.Rptr. 281, 388 P.2d 177]; *In re Raner,* 59 Cal.2d 635, 636 [30 Cal.Rptr. 814, 381 P.2d 638]; *People* v. *Wallace,* 59 Cal.2d 548, 551 [30 Cal.Rptr. 449, 381 P.2d 185]; and *Department of Mental Hygiene* v. *Hawley,* 59 Cal.2d 247, 252-253, fn. 5 [28 Cal.Rptr. 718, 379 P.2d 22]) and a number of Court of Appeal cases (e.g. *People* v. *Gonzales,* 256 Cal. App.2d 50, 53-55 [63 Cal.Rptr. 581]; *People* v. *Whelchel,* 255 Cal.App.2d 455, 460-462 [63 Cal.Rptr. 258]; *People* v. *Chacon,* 253 Cal.App.2d 1056, 1059 [61 Cal.Rptr. 807]; *People* v. *Hill,* 249 Cal.App.2d 453, 457 [57 Cal.Rptr. 551]) have de-

---

[3]At the time of the hearing in the instant matter section 5125 had to do with scientific research into causes and cures of various forms of sexual deviation.

[4]"Where one party has at stake an interest of transcending value—as a criminal defendant his liberty—this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt. *Tot* v. *United States,* 319 U.S. 463 [87 L.Ed. 1519, 63 S.Ct. 1241] *supra* . . . ." (*Speiser* v. *Randall,* 357 U.S. 513, 525-526 [2 L.Ed.2d 1460, 1472-1473, 78 S.Ct. 1332].)

scribed narcotic commitment proceedings as "civil," "non-punitive" and "remedial." A situation may well arise where such characterization may break down in the face of the reality of the addict's involuntary confinement. (Cf. *In re Gault*, 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428].) We do not believe, however, that the distinction between confinement as a criminal and loss of liberty as an addict whom the state hopes to cure is sufficiently artificial to prohibit a difference in the burden of proof. It must be remembered that in a narcotic commitment case the jury is in reality asked to confirm what is essentially a medical diagnosis. The People's burden of persuasion ought to be no greater than the degree of assurance with which reputable physicians express themselves. (*Bauman* v. *San Francisco*, 42 Cal.App.2d 144, 163-165 [108 P.2d 989].)

■ The equal protection point almost answers itself. Surely it cannot be successfully urged that the difference between a conviction for a crime and a commitment for treatment is so insubstantial that any classification based upon such difference is arbitrary and has no substantial relation to the legitimate object of the legislation. (*Baxstrom* v. *Harold*, 383 U.S. 107, 111 [15 L.Ed.2d 620, 623, 86 S.Ct. 1966] ; *Katzev* v. *County of Los Angeles*, 52 Cal.2d 360, 368-370 [341 P.2d 310].)

### Miranda Warnings

■ Finally defendant contends that he should have been advised of his right not to talk to Doctor Lavelle before being examined by him. Again the argument is bottomed on the assumption that this was a criminal proceeding. We need not pass on the point because defendant made no statement to Doctor Lavelle which, in any way, supported the doctor's conclusion.[5]

Nothing he obtained from defendant was of a "testimonial or communicative nature." (*Gilbert* v. *California*, 388 U.S. 263, 265-267 [18 L.Ed.2d 1178, 1183, 87 S.Ct. 1951] ; *United States* v. *Wade*, 388 U.S. 218, 221-223 [18 L.Ed.2d 1149, 1154,

[5]The record discloses that defendant denied use of narcotics to Doctor Lavelle. While we recognize that *Miranda* v. *Arizona*, 384 U.S. 436, 477 [16 L.Ed.2d 694, 725, 86 S.Ct. 1602, 10 A.L.R.3d 974], when applicable, reaches exculpatory as well as inculpatory statements, this evidence was not offered as proof of defendant's condition nor as a justification of the doctor's findings, but only as an explanation of the basis for the doctor's conclusions. In any event we are convinced beyond a reasonable doubt that by no stretch of the imagination could admission of this one utterance have constituted prejudicial error. (*Chapman* v. *California*, 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824].)

87 S.Ct. 1926]; *Schmerber* v. *California,* 384 U.S. 757, 761 [16 L.Ed.2d 908, 914, 86 S.Ct. 1826]; *People* v. *Ellis,* 65 Cal. 2d 529, 535-536 [55 Cal.Rptr. 385, 421 P.2d 393]; *People* v. *Graves,* 64 Cal.2d 208, 210 [49 Cal.Rptr. 386, 411 P.2d 114].) ■ We are not quite certain whether defendant's counsel also urges, on the authority of *United States* v. *Wade, supra,* that defendant was entitled to have counsel present while being examined by Doctor Lavelle. If that is the argument, it must be rejected on the authority of *Stovall* v. *Denno,* 388 U.S. 293, 296-301 [18 L.Ed.2d 1199, 1203-1206, 87 S.Ct. 1967] and *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].

We recognize that in *In re Spencer,* 63 Cal.2d 400 [46 Cal. Rptr. 753, 406 P.2d 33] and *People* v. *Anderson,* 63 Cal.2d 351 [46 Cal.Rptr. 763, 406 P.2d 43], decided almost one year before *Wade,* our Supreme Court held that if a defendant in a criminal case is interviewed by a psychiatrist outside of the presence of his attorney and the psychiatrist later testifies during the guilt phase of a criminal trial, incriminating statements may not be received on their merits but only for the purpose of showing the information upon which the psychiatrist bases his opinion. (*In re Spencer, supra,* p. 412.) *Spencer* and *Anderson* antedate *Wade* and *Gilbert* by two years.

We do not believe that the *Spencer-Anderson* rule was violated here even if defendant's hearing be equated to a criminal trial. That rule dealt with incriminating statements. Again we point out that Valdez made none. The prophylactic benefits of counsel's presence with respect to nontestimonial evidence were not vouchsafed until June 12, 1967, the date of the *Wade-Gilbert-Stovall* trilogy.

The order of commitment is affirmed.

Hufstedler, J., and Stephens, J., concurred.