[Crim. No. 19476. July 15, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
L. C. THOMAS, Defendant and Appellant.

632

## Counsel

Wilbur F. Littlefield and Richard S. Buckley, Public Defenders, John J. Gibbons, Alan H. Simon, Michael Tautfest and Laurence M. Sarnoff, Deputy Public Defenders, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Jack T. Kerry and Abram Weisbrot, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**MOSK, J.**—Two years ago we held that a person whom the state seeks to commit to a mental hospital as a "mentally disordered sex offender" (Welf. & Inst. Code, § 6300 et seq.) is entitled on several state and federal constitutional grounds to the safeguards of proof beyond a

reasonable doubt (*People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352]) and a unanimous verdict (*People* v. *Feagley* (1975) 14 Cal.3d 338, 349-358 [121 Cal.Rptr. 509, 535 P.2d 373]). In each case we expressly left open the question whether a person subjected to involuntary commitment proceedings as an alleged narcotics addict (Welf. & Inst. Code, § 3000 et seq.) is entitled to the same safeguards. We are now called upon to decide that question. After a careful review of the nature and consequences of narcotics addict commitment proceedings in California, we conclude they should likewise be governed by the *Burnick-Feagley* standards.

Defendant Thomas was convicted of second degree burglary in 1971. The proceedings were apparently not final when, on November 14, 1974, he was arrested and returned to custody on suspicion of being under the influence of heroin. The court adjourned the prior proceedings and ordered that a petition be filed to determine whether defendant was a narcotics addict within the meaning of Welfare and Institutions Code section 3051.[1] Two doctors were appointed to examine him, and testified at the ensuing hearing. (§ 3106.) The court found that defendant was a narcotics addict or in imminent danger of becoming addicted, and committed him to the custody of the Director of Corrections for confinement in the California Rehabilitation Center (§ 3300 et seq.) for the term prescribed by law (§§ 3200, 3201).

Defendant made a timely demand for a jury trial (§ 3051), and on his motion two additional doctors were appointed and examined him. In the course of the trial defendant twice requested instructions requiring proof of addiction beyond a reasonable doubt and a unanimous verdict. The court refused the requests, and instructed the jury instead that they could find addiction by a preponderance of the evidence and a three-fourths verdict. (§ 3108.) The jury found defendant to be in imminent danger of becoming an addict, and a poll revealed the vote was 11 to 1. The court then made a second order of commitment identical to the first, and defendant appeals therefrom. (Pen. Code, § 1237, subd. 1.)

---

[1]Section 3051 provides that a defendant shall be committed pursuant thereto if the court finds he "is a narcotic addict, or is by reason of the repeated use of narcotics in imminent danger of becoming addicted to narcotics . . . ." The latter phrase was defined in *People* v. *Victor* (1965) 62 Cal.2d 280, 298-305 [42 Cal.Rptr. 199, 398 P.2d 391].

Unless otherwise specified, all statutory references herein are to the Welfare and Institutions Code.

I

The importance of adequate procedural safeguards against an erroneous verdict in narcotics addict commitment proceedings is underscored by the close balance of the evidence in the case before us.

Defendant freely admitted that he had begun experimenting with heroin in 1971, and became addicted thereto by 1972. But he testified that under strong family pressure, including his wife's temporary separation from him, he reduced and finally discontinued his use of heroin in 1973, having his last "fix" in December of that year. Since that date his sole experiences with injections occurred in May 1974, when he twice took cocaine, and in October 1974, when he took codeine for pain following extraction of all his upper teeth.

Defendant gave the same history to each of the four doctors who examined him. They based their opinions, however, primarily on the physical appearance of certain "tracks" they observed on defendant's arms at the time of the examination. Such tracks typically appear as brownish discolorations of the skin following the lines of veins which have been the site of repeated and localized self-administered injections. They are commonly relied on as evidence of heroin addiction, but their value in that respect is subject to two important limitations.

First, because the discoloration tends to be permanent it gives no clue to the age of the track. Only when certain additional symptoms are present can an inference be drawn that there have recently been multiple injections into the vein: the symptoms include scab formation and a temporary inflammation or swelling. But such features disappear in an average of one to two months following discontinuance of the injections, after which it is again impossible to determine when the vein was last used for this purpose. Moreover, even when some swelling is present it must be carefully distinguished from a long-term hardening of such veins caused by permanent scar tissue from previous injections. In short, unless there is the appropriate kind and degree of traumatic swelling, the presence of tracks is inadequate to distinguish between recent and earlier use of the vein.

Secondly, the particular nature of the substance injected cannot be inferred from the appearance of the tracks alone. Repeated and localized self-administered injections of any nonnarcotic substance, or of a narcotic permissibly prescribed, will likewise cause discoloration and

swelling of the vein. ■ In the absence of corroborating evidence of heroin use, therefore, the appearance of the tracks is insufficient to support a conclusion that the person is currently a heroin addict. (*People v. Bruce* (1966) 64 Cal.2d 55, 64-65 [48 Cal.Rptr. 719, 409 P.2d 943].)

With this background we may better appraise the expert testimony in this case. The four doctors called to the stand were all well qualified by training and experience to give their opinions on the significance of the tracks found on defendant's arms. Yet their testimony was sharply divided. The two doctors who testified for the People stated as their opinion that although a majority of the tracks were old, two of them showed sufficient residual swelling to justify the inference that they had been the site of multiple injections some six to eight weeks prior to the examination, i.e., shortly before defendant's arrest. The witnesses then reasoned as follows: it is "statistically unlikely" that a person who has used heroin for any length of time will switch to a different drug; defendant admittedly had been addicted to heroin in 1971 and 1972; therefore the witnesses made the "assumption" that the substance he injected shortly before his arrest in November 1974 was heroin. On this and similar reasoning both doctors concluded that defendant was a narcotics addict.

By contrast, the two doctors who testified for the defense were equally firm in their opinion that none of the tracks on defendant's arms was recent. Thus the Los Angeles County Deputy Medical Examiner reviewed in detail the physical appearance of the tracks and concluded "They are much older than November of 1974." When shown a photograph of defendant's arm taken at the time of arrest on November 14, the doctor conceded that a number of small puncture wounds visible therein could have occurred within a few weeks prior thereto, but reiterated that it is impossible to tell what substance was injected on that occasion.

The final expert, a forensic psychiatrist with the longest experience among the witnesses in determining narcotic addiction, gave as his opinion that defendant was neither addicted nor in imminent danger of addiction. The doctor found the tracks on defendant's arms to be "all very old and faded, not consistent with frequently repeated injecting of any drugs in the months recently preceding my exam." In response to a hypothetical question, he testified that multiple injections of the drug

codeine in the period of a week or so could cause temporary swelling of the veins.[2]

As noted above, defendant testified that he had given himself a series of codeine injections for pain following extraction of all his upper teeth. He specified that the surgery took place in the Martin Luther King General Hospital in Los Angeles; he first visited the hospital on September 13, 1974, but left without treatment because too many people were waiting to see the doctor; he returned on October 23 for examination, and the surgery was performed on the following day; the codeine was prescribed for him at that time; and he injected it for the ensuing week or 10 days to relieve pain. In rebuttal, the People called a medical records custodian from Martin Luther King General Hospital who testified that every new patient is given a single, permanent identification number, and all treatment he receives thereafter at the hospital is recorded under the same number; according to defendant's medical record he came to the hospital only on September 13, 1974, and left without obtaining treatment; and there is no record of his returning in late October or of receiving dental treatment or a medication prescription. The witness explained that her information was taken directly from the hospital's computer and double-checked by examination of index cards; the computer would have showed any treatment received by defendant subsequent to September 13; and she had never known the computer to make a mistake.

In his closing argument to the jury the prosecutor repeatedly emphasized the apparent impeachment of defendant's testimony in what he termed "this crucial area." He stressed that the hospital record put before the jury was defendant's "only and sole chart" and contained "every bit of medical information" on this patient; that the chart showed no oral surgery performed on October 24 and no prescription for medication; and hence that "instead of the defense of [injecting] the codeine *which obviously is a good defense,* he was in fact shooting dope, heroin, and is in fact a narcotic addict" (italics added).

[2]Several lay witnesses also testified. A police officer described certain observations he made of defendant's physical appearance at the time of arrest which were assertedly symptoms of the withdrawal syndrome, and testified that defendant said he had taken some "dope" three days earlier. Defendant's use of the word "dope," however, was not defined. And it may be noted that the prosecution initiated on the basis of such observations, charging defendant with being under the influence of heroin, was subsequently dismissed for insufficient evidence as a matter of law.

Defendant's account of using heroin and then breaking the habit was corroborated by his wife and his former employment supervisor.

However, after the jury returned their verdict counsel investigated the matter further and discovered an additional record of the Martin Luther King General Hospital which demonstrated that defendant's account of his oral surgery and medication was true: this record showed that defendant did indeed visit the hospital on October 23 for an examination preparatory to extraction of his upper teeth, and at that time was in fact given a prescription for codeine. The record was accompanied by a certificate of the same custodian who testified at the trial, verifying that apparently through hospital mistake defendant had been given two permanent identification numbers rather than one, and the October treatment had been recorded under his alternate number. Defendant moved for a new trial on the basis of this newly discovered evidence; but the court, although finding that his counsel had acted with due diligence, denied the motion because it did not believe that a different verdict would have been probable had the jury been told these facts.[3]

## II

As noted at the outset, we held in *People* v. *Burnick* (1975) *supra,* 14 Cal.3d 306, that the standard of proof beyond a reasonable doubt is required in mentally disordered sex offender commitment proceedings by the due process clauses of the California Constitution (art. I, § 7, subd. (a)) and the Fourteenth Amendment to the United States Constitution. Our reasoning in *Burnick* is equally applicable here.

To begin with, the standard of proof by a preponderance of the evidence has heretofore been justified in narcotics addict commitment proceedings on the theory that under the relevant statute (§ 3108) the trial is to be conducted "as provided by law for the trial of civil cases," and commitment proceedings are deemed "civil in nature." (*People* v. *Valdez* (1968) 260 Cal.App.2d 895, 903-904 [67 Cal.Rptr. 583], followed in *People* v. *Moore* (1968) 69 Cal.2d 674, 685 [72 Cal.Rptr. 800, 446 P.2d 800]) In *Burnick,* however, we questioned the soundness of those decisions (14 Cal.3d at pp. 331-332, fn. 21), and expressly rejected their theory. Although mentally disordered sex offender proceedings were likewise to be tried "as provided by law for the trial of civil causes" (§ 6321), we explained that under the Evidence Code the courts retain the responsibility to determine whether a higher standard of proof is required in order to comply with constitutional commands. We reasoned

---

[3]Not surprisingly, defendant takes sharp issue on appeal with this ruling. Although we have misgivings about the denial of a new trial under the circumstances, we need not reach the question because reversal is required on other grounds. In the event of a retrial the full picture of defendant's hospital visits can now be presented to the jury.

that because involuntary commitment is incarceration against one's will regardless of whether it is called "civil" or "criminal" (*In re Gault* (1967) 387 U.S. 1, 50 [18 L.Ed.2d 527, 558, 87 S.Ct. 1428]), the choice of standard of proof implicates due process considerations which must be resolved by focusing not on the theoretical nature of the proceedings but rather on the actual consequences of commitment to the individual. (14 Cal.3d at pp. 314-318; accord, *In re Bye* (1974) 12 Cal.3d 96, 102-103 [115 Cal.Rptr. 382, 524 P.2d 854] (revocation of narcotics addict outpatient status); *In re Arthur N.* (1976) 16 Cal.3d 226, 240 [127 Cal.Rptr. 641, 545 P.2d 1345] (commitment to Youth Authority under supplemental petition).)

■ Two of those consequences we held determinative: if the proceedings seriously put at risk both the personal liberty and the good name of the individual, the safeguard of proof beyond a reasonable doubt is required. ■ Because we distilled that rule from *In re Winship* (1970) 397 U.S. 358 [25 L.Ed.2d 368, 90 S.Ct. 1068], which first invoked it in the context of a commitment for juvenile delinquency, we proceeded to compare the place and potential length of confinement of juveniles with those of mentally disordered sex offenders. (14 Cal.3d at pp. 318-321.) The analysis is no less instructive in the case at bar.

A youth adjudged to be a juvenile delinquent, we noted, "may or may not be confined in an institution; other less drastic methods of control are available, including placement in a 'suitable family home' or release on probation. (Welf. & Inst. Code, § 727 et seq.)" (*Id.,* at p. 319.) In sharp contrast, if the court finds that a person is addicted to narcotics or in imminent danger of addiction it has no option but to order him committed "to the custody of the Director of Corrections for confinement in" the California Rehabilitation Center (hereinafter CRC). (§§ 3050, 3051, 3106.5; see *People* v. *Superior Court (Warpole)* (1971) 21 Cal.App.3d 911, 914 [98 Cal.Rptr. 894].) At this stage of the proceeding there is no half-way house, no probation alternative.

Although the CRC is not among the facilities specifically listed as state prisons (Pen. Code, §§ 2000-2049.6), it is nonetheless "under the jurisdiction of the Department of Corrections" (Welf. & Inst. Code, § 3300), its "supervision, management and control" is vested in the Director of Corrections (§ 3305), and its superintendent is appointed "pursuant to Section 6050 of the Penal Code," which provides for the appointment of state prison wardens (§ 3304). The purpose of the CRC is not only treatment and rehabilitation but also the "control" and

"confinement" of persons committed thereto. (§ 3301; see also §§ 3000, 3001.) The rules governing the facility are made by the Director of Corrections (§ 3303), and the general state prison regulations of part 3 of the Penal Code "apply to said institution as a prison under the jurisdiction of the Department of Corrections and to the persons confined therein insofar as such provisions may be applicable." (§ 3305.)[4] Finally, every person who escapes or attempts to escape from such custody "is guilty of a crime punishable by imprisonment in the state prison." (§ 3002.) In short, as we recently characterized this confinement, a person committed or recommitted as a narcotics addict "is incarcerated in the walled facility at Norco [i.e., the CRC], a security institution . . . ." (*In re Bye* (1974) *supra,* 12 Cal.3d 96, 102.)

Not only is the loss of freedom of the narcotics addict more severe than that of the juvenile, it is potentially of a longer duration. "Any confinement of the juvenile is ordinarily limited by law to a few years at most, terminating automatically when he reaches age 21 or shortly thereafter. (Welf. & Inst. Code, §§ 1769-1771; but see §§ 1800-1803.)" (14 Cal.3d at p. 320.) But a person involuntarily committed as a narcotics addict after conviction of crime may be confined for an indefinite period up to a maximum of seven years, and, upon court order, for an additional three-year period of "extension." (§ 3201.)[5] The 10-year total, of course, far exceeds the possible sentence for any misdemeanor conviction which can lead to a narcotics addict commitment under section 3050, and is greater than the maximum sentences for many felony convictions leading to such commitment under section 3051 and not otherwise excluded by law (§ 3052).[6]

It is true that prior to discharge from the program a person may be conditionally released on "outpatient status." (§ 3150 et seq.) But before

---

[4]As we noted in *People* v. *Feagley* (1975) *supra,* 14 Cal.3d 338, 364, "Among those provisions are laws requiring the Department of Corrections to furnish each inmate 'with a bed of straw or other suitable material, and sufficient covering of blankets, and with garments of coarse, substantial material and of distinctive manufacture' (Pen. Code, § 2084), to sequester any personal property of value (Pen. Code, § 2085), to censor the inmate's correspondence except with attorneys or public officials (Pen. Code, § 2600), . . ."

[5]Persons in the small class of addicts who voluntarily commit themselves to the CRC or are committed without prior conviction of crime (§ 3100 et seq.) may be retained in custody for a maximum of two years and six months. (§ 3201.)

[6]By way of comparison, we note that at the time of defendant's conviction of second degree burglary, that crime carried an alternative penalty of not more than 1 year in county jail or 1 to 15 years in state prison. (Pen. Code, § 461.) As of July 1, 1977, moreover, the alternative state prison sentence for the same crime is reduced to 16 months or 2 or 3 years. (Stats. 1976, ch. 1139, §§ 98, 207.)

1965 the same release was termed a "parole" (former Pen. Code, §§ 6403-6404); and although the name of the status has been changed, its substance remains "strikingly similar to California parole procedures." (Note, *Control and Treatment of Narcotics Addicts: Civil Commitment in California* (1969) 6 San Diego L.Rev. 35, 45.) Thus the statutes provide that the outpatient program "shall be administered by the Department of Corrections" (§ 3151), and shall include "close supervision of the person" and compulsory retaking and return to the CRC whenever it appears from reports of law enforcement officers that reconfinement would serve the best interests of "the person and society" (§ 3152).

The second prong of the *Burnick* analysis was a comparison of the stigma flowing from an adjudication of juvenile delinquency and a commitment as a mentally disordered sex offender. (14 Cal.3d at pp. 321-322.) Again our reasoning is apposite here, and we may reiterate it with appropriate substitutions of the term "narcotics addict" for the words "mentally disordered sex offender."

Juvenile delinquency proceedings "are conducted in privacy: the statute flatly declares that 'the public shall not be admitted' (Welf. & Inst. Code, § 676; see also § 675). Moreover, five years after the juvenile court's jurisdiction terminates, the judge or probation officer 'may destroy all records and papers in the proceedings concerning the minor.' (§ 826, subd. (a).) No such confidentiality surrounds a [narcotics addict] trial, which is open to the public and hence to the news media; and such trial, of course, results in permanently accessible public records of the event and its outcome.

"Secondly, to the extent they do become known, acts of juvenile misconduct are often minimized or forgiven on such commonplace rationalizations as 'boys will be boys' or 'youth will have its fling,' coupled with a belief of folk psychology that the miscreant is just 'going through a stage' and with maturity will 'outgrow' his bad habits. No such indulgence is shown towards the convicted [narcotics addict], however immature or impulsive he may be." (*Id.,* at p. 322.) He remains burdened with the public's often lurid image of the "dope fiend" or, in contemporary jargon, the "junkie."

That image traditionally includes a variety of highly pejorative attributes: the heroin addict is widely believed to be a self-indulgent social parasite who caters to his uncontrolled craving for the drug at the expense of his family and community obligations; a member of a

criminal subculture who feeds his habit by engaging in theft, prostitution, or worse; and a dangerous proselytizer who corrupts and enslaves the young and the weak in order to gratify his own needs.[7] Indeed, that the Legislature itself shares this negative view is strongly implied by the choice of words in its declaration of intent: the purpose of CRC treatment, we are told, is not only for the protection of the addict against himself "but also for the prevention of *contamination* of others and the protection of the public." (Italics added; § 3000.)

Contagious diseases, of course, "contaminate" the public. But the holding of *Burnick* is that before an individual can be branded a moral leper and locked up for years in a security institution he is entitled to a higher standard of proof than a mere preponderance of the evidence, the test appropriate for " 'run-of-the-mill automobile negligence actions' " (14 Cal.3d at p. 310). Rather, for the reasons stated above the standard in narcotics addict commitment proceedings must be as high as it is in juvenile delinquency proceedings, i.e., proof beyond a reasonable doubt. "Anything less will fall short of providing the level of due process required by the California and federal Constitutions." (*Id.,* at p. 322.)[8]

### III

The instruction permitting a less than unanimous verdict in the case at bar was predicated on section 3108, which declares in part that the person sought to be committed shall be discharged unless he is found to be a narcotics addict "by at least three-fourths of the jury." In *Burnick's* companion case of *People* v. *Feagley* (1975) *supra,* 14 Cal.3d 338, we impliedly questioned the validity of the latter language (*id.,* at p. 357, fn. 13), and we held unconstitutional its identically worded counterpart in the mentally disordered sex offender law, section 6321. Once more the essential parallelism of the two statutory schemes dictates our result.

---

[7]Among the practical consequences of this image is the well-documented resistance of many public and private employers against hiring former addicts. (See Note, *Employment Discrimination Against Rehabilitated Drug Addicts* (1974) 49 N.Y.U. L.Rev. 67, 68.)

[8]Insofar as they hold to the contrary, *People* v. *Valdez* (1968) *supra,* 260 Cal.App.2d 895, 903-904, is disapproved and *People* v. *Moore* (1968) *supra,* 69 Cal.2d 674, 685, is overruled.

Although the present case challenges an order of commitment made after a jury trial (§ 3108), the rule we declare herein manifestly applies to any stage of the proceedings in which the person is involuntarily committed to the custody of the Director of Corrections pursuant to a finding that he is addicted or in imminent danger of addiction to narcotics (e.g., §§ 3050, 3051, 3106.5).

The primary ground of invalidity identified in *Feagley* was a violation of the provisions of the California Constitution guaranteeing due process (art. I, § 7, subd. (a)) and a unanimous jury verdict (art. I, § 16). We recognized that neither applied by its terms to "civil" actions, but we recalled our statement in *In re Gary W.* (1971) 5 Cal.3d 296, 307 [96 Cal.Rptr. 1, 486 P.2d 1201], that "the California Legislature has recognized that the interests involved in civil commitment proceedings are no less fundamental than those in criminal proceedings and that liberty is no less precious because forfeited in a civil proceeding than when taken as a consequence of a criminal conviction." We then explained that a mentally disordered sex offender proceeding has "all the trappings of a criminal prosecution, together with the worst consequences of the latter" (14 Cal.3d at p. 350), and we supported our conclusion by an analysis of the statutes in question. (*Id.,* at pp. 350-351.)

Undertaking a like analysis here, we observe that at the trial level the petition for commitment was filed by the district attorney (§ 3051), who also presented the evidence against defendant. Defendant was entitled to be arraigned and advised of his rights, including the right to be present at the hearing and, if indigent, the right to a court-appointed attorney or the services of the public defender. (§ 3104.) He was entitled to compel the attendance of witnesses by subpoena (§ 3105), and the examining doctors were required to be present and testify (§ 3106). Such a defendant can waive the hearing on the petition, but only by consenting to do so in open court or in writing, and after arraignment and consultation with counsel. (§ 3107.)[9] Even more explicit is the statute governing the ensuing jury trial, which declares that "The person committed shall be awarded all his constitutional rights including, but not limited to, his right to counsel, his right to notice of the nature of the proceedings brought against him, his right to the process of the court to compel the attendance of witnesses in his behalf, and his right to be confronted with witnesses." (§ 3108.)

Other close similarities between this proceeding and a criminal prosecution appeared at the appellate level. We gave the case an ordinary "criminal" title and assigned it a "criminal" docket number. Defendant's counsel on appeal is the Los Angeles County Public Defender; in representing defendant before this court he is acting presumably pursuant to Government Code section 27706, subdivision

---

[9]However, for the further protection of the person we held in *In re Walker* (1969) 71 Cal.2d 54, 58-59 [77 Cal.Rptr. 16, 453 P.2d 456], that he is not allowed to waive the initial medical examination and report designed to verify his alleged addicted condition.

(a), which authorizes him to seek review in appropriate cases from judgments of "conviction."[10] And on this appeal the cost of the transcripts of the proceedings below was paid by the county.

As it was in *Feagley,* "The authority for the latter payment is instructive. In *Gross* v. *Superior Court* (1954) 42 Cal.2d 816 [270 P.2d 1025], a defendant found to be a mentally disordered sex offender and committed to an 'institutional unit' on the grounds of a state prison requested free transcripts of the commitment proceedings to aid him in presenting his appeal. Then as now, the sole authorization for such transcripts was Government Code section 69952, providing that 'In criminal cases' the fee for a transcript shall be paid out of the county treasury. Because the statute was expressly limited to 'criminal cases,' the clerk of the superior court refused the request. On the defendant's application for writ of mandate, however, we ordered free transcripts to be prepared. We were not misled by the argument of county counsel that this was a civil proceeding: we recognized it was 'not strictly a criminal case,' but stressed it had certain of 'the features pertinent to such cases.' (*Id.,* at p. 821.) We then reviewed the various rights of a defendant charged with being a mentally disordered sex offender . . . and concluded (*ibid.*), 'Since those things are matters pertaining to the protection and rights of a person similar to one involved in a criminal case we believe he falls within the terms of section 69952 of the Government Code, *supra.*' " (14 Cal.3d at p. 351.)

In *People* v. *Victor* (1965) *supra,* 62 Cal.2d 280, 288-289, we applied the reasoning of *Gross* to an appeal brought under the narcotics addict commitment program. Recalling our previous observation that the commitment procedures under that program and the mentally disordered sex offender law are "analogous" (*In re De La O* (1963) 59 Cal.2d 128, 156 [28 Cal.Rptr. 489, 378 P.2d 793, 98 A.L.R.2d 705]), we quoted from the *Gross* analysis and held that "similar considerations obtain here and lead us to the same conclusion, i.e., that persons involuntarily committed to the custody of the Director of Corrections under this

---

[10]Section 27706, subdivision (a), provides in relevant part that the public defender "shall prosecute all appeals to a higher court or courts of any person who has been convicted, where, in his. opinion, the appeal will or might reasonably be expected to result in the reversal or modification of the judgment of conviction."

program have the right to a free transcript on an appeal from the order of commitment."[11]

Again we may substitute the term "narcotics addict" and conclude as we did in *Feagley*, "If a defendant charged with being a [narcotics addict] is thus entitled to free transcripts on appeal despite the express limitation of the statute to 'criminal cases,' he must a fortiori be entitled to the far more important right of jury unanimity despite the implied limitation of the Constitution to criminal cases." (14 Cal.3d at p. 351.)

The second branch of the *Feagley* reasoning on this point is a consideration of the consequences of commitment to the individual. But in part II of this opinion we have shown that a person committed as a narcotics addict suffers so severe a curtailment of liberty and so lingering a moral stigma that he is entitled to the same standard of proof beyond a reasonable doubt accorded to a criminal defendant. For identical reasons he is also entitled to the same guarantee of jury unanimity enjoyed by such a defendant. To the extent that right is denied by section 3108, the statute violates the due process and unanimous verdict clauses of the California Constitution. (Art. I, §§ 7, subd. (a), and 16.)[12]

## IV

■ Both the standard of proof and the degree of jury unanimity, of course, closely affect the reliability of any determination that a person is addicted or in imminent danger of addiction to narcotics. Accordingly, our holdings herein are designed to overcome aspects of narcotics addict commitment proceedings which "substantially impair the truth-finding function," and hence they must be given complete retroactive effect. (*People* v. *Burnick* (1975) *supra,* 14 Cal.3d 306, 332 (*Burnick* rule held

---

[11]Twice thereafter the *Victor-Gross* analysis was invoked to justify extending additional rules of criminal practice to narcotics addict commitment proceedings. In *People* v. *Moore* (1968) *supra,* 69 Cal.2d 674, 681-682, we held applicable the rule excluding illegally obtained evidence, reasoning that "Narcotic addict proceedings involve a loss of liberty, and the proceedings are for the benefit of society as well as the addict. [Citations.] Whatever the label that may be attached to those proceedings, it is apparent that there is a close identity to the aims and objectives of criminal law enforcement [citation] . . . ." (*Id.,* at p. 682.) And in *People* v. *Malins* (1972) 24 Cal.App.3d 812, 819-820 [101 Cal.Rptr. 270], the Court of Appeal held applicable to these proceedings the "criminal" rule that after a jury trial is demanded it is not waived merely by failure to appear.

[12]In view of this conclusion we need not lengthen our opinion by a discussion of defendant's alternative contention on the same issue, i.e., that section 3108 denies him equal protection of the laws because a provision of the Lanterman-Petris-Short Act (§ 5303) expressly grants the right to a unanimous verdict to persons committed as "imminently dangerous" under that act. We held a similar argument to be meritorious in *Feagley.* (14 Cal.3d at pp. 352-358.)

fully retroactive); *Ivan V.* v. *City of New York* (1972) 407 U.S. 203, 205 [32 L.Ed.2d 659, 661-662, 92 S.Ct. 1951] (*Winship* rule held fully retroactive).)

The order appealed from is reversed.

Bird, C. J., Tobriner, J., Manuel, J., and Sullivan, J.,\* concurred.

**RICHARDSON, J.**—I concur under the compulsion of *People* v. *Burnick* (1975) 14 Cal.3d 306 [121 Cal.Rptr. 488, 535 P.2d 352] and *People* v. *Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373].

**CLARK, J.**—I dissent for the reasons expressed in *People* v. *Burnick* (1975) 14 Cal.3d 306, 332-337 [121 Cal.Rptr. 488, 535 P.2d 352] (Burke, J., dissenting) and *People* v. *Feagley* (1975) 14 Cal.3d 338, 376-383 [121 Cal.Rptr. 509, 535 P.2d 373] (Burke, J., dissenting).

---

\*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.