[Civ. No. 47716. First Dist., Div. Three. June 6, 1980.]

Conservatorship of the Person and Estate of
MARY EDITH SANDERSON.
MARY CARTER MEYER, Petitioner and Respondent, v.
MARY EDITH SANDERSON, Objector and Appellant.

COUNSEL

Dell'Ergo & Tinsley and Franklin J. Flocks for Objector and Appellant.

John E. Miller and Miller & Grilli for Petitioner and Respondent.

OPINION

WHITE, P. J.—Appellant Mary Edith Sanderson is a 76-year-old woman. Appellant's daughter, respondent Mary Carter Meyer, filed a petition for appointment of a conservator of the person and estate of appellant. It is alleged in the petition that appellant is suffering from an organic brain disease which renders her incoherent and disoriented at certain times. It is further alleged in the petition that appellant "has broken her hip and is unable to care for herself." Because of appellant's mental and physical conditions, it is alleged in the petition that she is unable to care for herself or to manage her financial resources. The trial court found the petition was "supported by substantial evidence" and appointed respondent the conservator of the person and estate of appellant. Appellant appeals and contends that the trial court should have required proof beyond a reasonable doubt before appointing a conservator.[1]

Dr. J. Sewall Brown, appellant's personal physician for 20 years, testified concerning her medical history and condition. On July 20 or 24, 1978, a social worker called Dr. Brown and told him that appellant was not eating and she was weak and nauseated, but appellant did not want to see the doctor. Dr. Brown did persuade appellant to come to his office on August 4, 1978. Since on August 4 appellant was so weak that she was unable to stand, Dr. Brown placed her in the hospital. When appellant first arrived at the hospital she was having hallucinations—she saw monkeys on the ceiling and cats at the windows. It was finally determined that appellant had pernicious anemia. Appellant's condition improved greatly after she was given a number of transfusions and she was discharged after she had been in the hospital for a week. The treatment for the anemia is a monthly B-12 shot.

---

[1]An order appointing a conservator is an appealable order. (Prob. Code, § 2101.)

Dr. Brown testified that appellant was extremely difficult to care for during her stay in the hospital. Appellant removed the intravenous catheter and refused to stay in bed. It was necessary to have a sitter service "at the bedside so that she would not damage herself or the other patients in the room." When Dr. Brown released appellant from the hospital, he was of the opinion that she could care for herself if she took her medication. Following her release from the hospital, appellant failed to keep an appointment with Dr. Brown so he went to her home and gave her a B-12 injection.

On September 5, 1978, appellant was again admitted to the hospital. Two women had gained entrance to appellant's home and in an effort to obtain appellant's purse had pushed her down. Appellant broke or fractured her hip. Because appellant's blood count was low it was necessary to give her two transfusions before surgery could be performed. At the end of September appellant was discharged to a convalescent hospital. Two months after the hip operation, appellant was able to walk without assistance.

Dr. Brown characterized appellant as a strong-willed, stubborn, tough person. In Dr. Brown's opinion, appellant is not competent to take care of her financial affairs. Dr. Brown testified he would be "apprehensive about her future" if appellant were to live alone. Dr. Brown felt appellant should live in a place where she could have her own room or apartment but where meals could be provided.

Respondent testified she went to see her mother in May and June of 1978 and found her mother's house was dirty and there was little food in the house. When appellant was admitted to the hospital in August of 1978, she was carrying a number of uncashed checks in her purse. Appellant gave the checks to her son for safekeeping, who in turn delivered them to respondent. While appellant was in the hospital, respondent went through her house and discovered other uncashed checks and some unpaid bills lying on the counter near the telephone. Respondent was of the opinion that her mother is not able mentally to take care of her own affairs.

Respondent agreed with Dr. Brown that her mother is a strong-willed, stubborn, tough individual. Respondent stated that her mother felt she was trying to take all of her money. Respondent admitted that her mother had been consistent in this regard and had felt the same way when her physical and mental condition had been better.

Appellant testified she was born on May 30, 1903. She stated that she had never had a checking account and paid her bills by money order or cash. When appellant was asked why she had not paid the bills that her daughter had found in her home, she said, "No, I have no reason. I just didn't get around to it."

Appellant testified that she is currently living in a rest home in San Jose. She stated she wanted to get a small apartment in Palo Alto so she could be near her friends. She further stated, "I want to be on my own, come and go as I please and live by myself." Appellant testified that she is able to manage her own affairs. She stated emphatically that she did not want her son or daughter or anyone else to take care of her affairs.

### Standard of Proof

In *Conservatorship of Roulet* (1979) 23 Cal.3d 219 [152 Cal.Rptr. 425, 590 P.2d 1], the California Supreme Court held that "proof beyond a reasonable doubt" is the proper standard to be applied before a conservator can be appointed under the grave disability provisions of the Lanterman-Petris-Short Act (LPS Act). (Welf. & Inst. Code, § 5350 et seq.) Appellant contends the rule of *Roulet* should also be applied in Probate Code conservatorship proceedings. Respondent, conservator, on the other hand argues that a probate conservatorship does not result in the type of deprivation of liberty which occurs under an LPS conservatorship and therefore the reasoning of *Roulet* is not applicable to the instant case.

In *Roulet*, the court noted that under the LPS Act a conservator has the power to involuntarily commit a conservatee to a state mental institution for up to one year. In *Roulet* respondent was named the conservator of the person and estate of appellant. Respondent was given the power to confine appellant in a mental institution and placed her in Camarillo State Hospital. (*Id.*, at p. 222.) Pursuant to subdivision (d) of section 5350 of the Welfare and Institutions Code, appellant demanded a jury trial on the issue of whether she was gravely disabled. At trial appellant requested that the jury be instructed that a conservator could be appointed for her only if the jury unanimously agreed, beyond a reasonable doubt, that appellant was gravely disabled as the result of mental disorder. The trial court refused this instruction and

the Supreme Court held the refusal was erroneous. (*Id.*, at p. 222.) The court held, "The appointment of a conservator for appellant and her subsequent confinement in a mental hospital against her will deprived appellant of freedom in its most basic aspects and placed a lasting stigma on her reputation." (*Id.*, at p. 223.)

The court in *Roulet* noted that involuntary confinement is a direct form of physical restraint which ""is scarcely less total than that effected by confinement in a penitentiary."" (*Id.*, at p. 224.) Respondent in *Roulet* relied upon the fact that appellant's commitment is only a "civil" confinement for remedial purposes. The court rejected the reliance on the civil label quoting *People* v. *Thomas* (1977) 19 Cal.3d 630, 638 [139 Cal.Rptr. 594, 566 P.2d 228], as follows: ""[B]ecause involuntary commitment is incarceration against one's will regardless of whether it is called "civil" or "criminal" [citation], the choice of standard of proof implicates due process considerations which must be resolved by focusing not on the theoretical nature of the proceedings but rather on the actual consequences of commitment to the individual."" (*Conservatorship of Roulet, supra*, at p. 225.)

Nor was the court in *Roulet* swayed by the fact that appellant had her liberty taken away, allegedly for her own good. ""Regardless of the purposes for which the incarceration is imposed, the fact remains that it is incarceration. The rehabilitative goals of the system are admirable, but they do not change the drastic nature of the action taken."" (*Id.*, at p. 225.)

The court in *Roulet* noted that a gravely disabled person for whom a conservatorship has been established under the LPS Act faces the loss of many other liberties in addition to the loss of his or her freedom from physical restraint. (*Id.*, at p. 227.) An LPS conservator is also given the powers granted to the guardian of an incompetent in chapters 7, 8 and 9 of division 4 of the Probate Code. (Welf. & Inst. Code, § 5357, Prob. Code, § 1852.) A conservator under the Probate Code is granted these same powers.[2] (Prob. Code, § 1852.)

---

[2]These powers include "payment of the conservatee's debts and collection or discharge of debts owed the conservatee (Prob. Code, § 1501); management of the conservatee's estate, including sale or encumbrance of the conservatee's property (Prob. Code, §§ 1502, 1530); commencement, prosecution, and defense of actions for partition of the conservatee's property interests (Prob. Code, §§ 1506-1508); disposition of con-

The Supreme Court in *Roulet* also determined that a "stigma" attaches when an individual is found to be gravely disabled due to a mental disorder. "'Not only is there physical restraint [when an individual is confined in a mental hospital], but there is injury to protected interests in reputation [citations], an interest in not being improperly or unfairly *stigmatized* as mentally ill or disordered.'" (*Id.*, at p. 229.) The court continued: "Moreover, grave disability proceedings carry special threats to reputation. A finding of grave disability is equivalent to a finding that a person is unable to feed, clothe or house himself because of a mental disorder ([Welf. & Inst. Code,] § 5008, subd. (h) (1)). It is implausible that a person labelled by the state as so totally ill could go about, after his release, seeking employment, applying to schools, or meeting old acquaintances with his reputation fully intact." (*Id.*, at p. 229.) The Supreme Court in *Roulet* concluded: "A consistent line of cases decided by the United States Supreme Court and by this court require us to reject respondent's reliance on 'civil' labels and to hold that since grave disability proceedings 'seriously put at risk both the person-

---

servatee's money or other property for court-approved compromises or judgment (Prob. Code, §§ 1510, 1530a); deposit of the conservatee's money in a bank, savings and loan institution, or credit union (Prob. Code, § 1513); the giving of proxies to vote shares of conservatee's corporate stocks (Prob. Code, § 1517); and the borrowing of money when it will benefit the conservatee (Prob. Code, § 1533). In addition, the court may grant the conservator any or all of the powers specified in Probate Code section 1853." (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 227.)

Probate Code section 1853 provides in part as follows: "To institute and maintain all *actions and other proceedings for the benefit of and to defend all actions and other proceedings against the conservatee or the conservatorship estate; to take, collect and hold the property of the conservatee; to contract for the conservatorship and to perform outstanding contracts and thereby bind the conservatorship estate; to operate at the risk of the estate any business, farm or enterprise constituting an asset of the conservatorship, to grant and take options; to sell at public or private sale; to create by grant or otherwise easements and servitudes; to borrow money and give security for the repayment thereof; to purchase real or personal property; to alter, improve and repair or raze, replace and rebuild conservatorship property; to let or lease property for any purpose including exploration for and removal of gas, oil and other minerals and natural resources and for any period, including a term commencing at a future time; to loan money on adequate security; to exchange conservatorship property; to sell on credit provided that any unpaid portion of the selling price shall be adequately secured; to vote in person or by proxy all shares and securities held by the conservator; to exercise stock rights and stock options; to participate in and become subject and to consent to the provisions of any voting trust and of any reorganization, consolidation, merger, dissolution, liquidation or other modification or adjustment affecting conservatorship property; to effect necessary insurance for the proper protection of the estate, to pay, collect, compromise, arbitrate or otherwise adjust any and all claims, debts or demands upon the conservatorship, including those for taxes; to abandon valueless property, and to employ attorneys, accountants, investment counsel, agents, depositaries and employees and to pay the expense therefor from the conservatorship estate."

al liberty and the good name of the individual, the safeguard of proof beyond a reasonable doubt is required.'" (*Id.*, at pp. 229-230.)

█ The question for this court to resolve is whether the conservatorship proceedings under the Probate Code deprive an individual of freedom and place a lasting stigma on the individual's reputation.

A probate conservator cannot place a conservatee in a mental health facility against his will. (Prob. Code, § 1851.) However, a probate conservator "has the care, custody and control of the conservatee and may fix the residence and domicile of the conservatee at any place within this state, but not elsewhere without the permission of the court." (*Id.*) As mentioned earlier a probate conservator has the same powers as an LPS conservator, other than the power to place the conservatee in a mental health facility. Respondent contends that a probate conservatee does not suffer the same deprivation of liberty as an LPS conservatee.

Respondent further asserts under the LPS proceedings there is a stigma of mental illness but there is none under probate conservatorship proceedings. Under the LPS Act a "conservator of the person, of the estate, or of the person and the estate may be appointed for any person who is gravely disabled as a result of mental disorder or impairment by chronic alcoholism." (Welf. & Inst. Code, § 5350.) Gravely disabled is defined in Welfare and Institutions Code section 5008, subdivision (h) as "(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter; or [¶] (2) A condition in which a person, has been found mentally incompetent under Section 1370 of the Penal Code and all of the following facts exist: [¶] (i) The indictment or information pending against the defendant at the time of the commitment charges a felony involving death, great bodily harm, or a serious threat to the physical well-being of another person. [¶] (ii) The indictment or information has not been dismissed. [¶] (iii) As a result of mental disorder, the person is unable to understand the nature and purpose of the proceedings taken against him and to assist counsel in the conduct of his defense in a rational manner."

Under the Probate Code conservatorship proceedings the court "shall appoint a conservator of the person and property or person or property of any adult person who, in the case of a conservatorship of the person, is unable properly to provide for his personal needs for physical health,

food, clothing or shelter, and, in the case of a conservatorship of the property, is substantially unable to manage his own financial resources, or resist fraud or undue influence. . . ." (Prob. Code, § 1751.)

Neither the LPS Act nor the Probate Code conservatorship provisions specify a standard of proof. (*Conservatorship of Roulet, supra,* 23 Cal.3d 219, 236 (dis. opn. of Clark, J.).) The LPS Act incorporates by reference Probate Code conservatorship provisions. (Welf. & Inst. Code, § 5350.) Although Probate Code provisions state that civil trial procedures are applicable, the provisions do not specify a particular standard of proof. (Prob. Code, §§ 1230, 1233, 1702; *Conservatorship of Roulet, supra,* at p. 236 (dis. opn. of Clark, J.).) Evidence Code section 115 states the general burden of proof rule as follows: "Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence." The burden of proof "otherwise provided by law" includes decisional law. (Evid. Code § 160; *People* v. *Burnick* (1975) 14 Cal.3d 306, 313-314 [121 Cal.Rptr. 488, 535 P.2d 352].) Since the Probate Code conservatorship provisions do not specify a standard of proof, it is for this court to determine which standard of proof should be applied in view of the consequences to an individual of having a probate conservator appointed of his person and estate.

"The three traditional standards of proof, (1) evidence beyond a reasonable doubt, (2) clear and convincing evidence, and (3) preponderating evidence, represent 'an attempt to instruct the fact finder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" (*Conservatorship of Roulet, supra,* at p. 237 (dis. opn. of Clark, J.).) As the seriousness of the consequences resulting from an erroneous judgment increases, a stricter standard of proof is required to mitigate against the possibility of error. (*People* v. *Burnick, supra,* 14 Cal.3d 306, 310.)

While having a residence chosen for an individual (in this case a rest home), may not be the same deprivation of liberty as being placed in a mental institution, there can be little doubt that if a residence is chosen for an individual that his or her freedom has been seriously curtailed. Since the conservator of the person and estate of a conservatee is given complete control over the conservatee's property, the conservatee's ability to leave the domicile chosen for him or her is further restricted by financial constraints or by rules of the domicile chosen for him. The po-

tential for deprivation of liberty under probate conservatorship is illustrated by the facts of this case. Appellant had lived much of her life in Palo Alto and wished to obtain an apartment in Palo Alto. However, she was placed in a rest home in San Jose.

Respondent states that many probate conservatorships are established for individuals who have substantial physical illness. Therefore, respondent asserts that the "'stigma' of mental illness is not applicable to all, or perhaps even most probate conservatorships." However, there can be little doubt that a "stigma" attaches to a person who has been determined to be unable to feed, clothe, house himself or take care of his financial resources. (Prob. Code, § 1751; *Conservatorship of Roulet, supra,* at p. 229.)

Balancing the benefit and purpose of the probate conservatorship proceedings against the adverse consequences to the individual clearly suggests the proper standard is clear and convincing proof.[3] The deprivation of liberty and stigma which attaches under a probate conservatorship is not as great as under an LPS conservatorship. However, to allow many of the rights and privileges of everyday life to be stripped from an individual "'under the same standard of proof applicable to run-of-the-mill automobile negligence actions'" cannot be tolerated. (*People* v. *Burnick, supra,* 14 Cal.3d 306, 310.)

The holding in this case should be applied only to cases not yet final as of the date on which this decision becomes final. (*Conservatorship of Roulet, supra,* at p. 235, fn. 18.)

There is a substantial likelihood that the trial court would have reached a different result if it had applied the clear and convincing evidence standard rather than a preponderance of the evidence standard.

---

[3]The purpose of the probate conservatorship has been stated as follows: "'A great many elderly or physically or mentally ill persons are reluctant to ask that a guardian be appointed to conduct their affairs because of the label of "incompetent" which attaches to them under the present law. Often where the person affected is himself willing to have a guardian appointed, his relatives resist the suggestion for the same reason. For these reasons, there are in California today a great many people whose affairs should be given the protection of a guardianship but for whom such protection has not been sought. The proposed legislation, by calling the person requiring assistance a "conservatee," and the person appointed by the court to assist him a "conservator," and by eliminating all reference to "incompetency" seeks to overcome the reluctance to use the protection which should be available under the law.'" (*Place* v. *Trent* (1972) 27 Cal.App.3d 526, 532 [103 Cal.Rptr. 841].)

The evidence presented at the hearing is susceptible to the interpretation that appellant is a strong-willed, tough person rather than a person who is unable to feed, clothe and house herself.

The order appealed from is reversed.[4]

Scott, J., and Dearman, J.,* concurred.

Respondent's petition for a hearing by the Supreme Court was denied August 6, 1980.

---

[4]Any question of attorney's fees is best left to the determination of the trial court on remand.

*Assigned by the Chairperson of the Judicial Council.