[No. E013626. Fourth Dist., Div. Two. Dec. 21, 1994.]

Guardianship of DIANA B. et al., Minors.
JOSE R. et al., Petitioners and Respondents, v.
GLORIA B., Objector and Appelllant.

COUNSEL

Robert Pacheco for Objector and Appellant.

Criste, Criste & Pippin and Marilyn Fisher for Petitioners and Respondents.

OPINION

**RAMIREZ, P. J.**—Appellant Gloria B., mother of the minor children and objector in the court below, appeals from the trial court order granting the petition filed by petitioners Jose and Jennie R. (respondents herein) seeking to be appointed guardians of the minor children, Diana (also referred to in the record and in this opinion as Deana) and Brenda, born in 1980 and 1982, respectively. The sole issue on appeal is whether the trial court erred when it based the grant of the guardianship petition on findings supported by a preponderance of the evidence rather than by clear and convincing evidence. We find no error and we affirm.

*Facts*

The factual record in this appeal, including augmentation by both parties, consists primarily of the petition for temporary guardianship filed by the respondents in January 1992, with the attached 16-page declaration presenting the factual circumstances of the case from the respondents' point of view; and 2 documents identified as closing argument and points and authorities filed in April 1993 by appellant, following 10 days of court trial, which reviewed the position taken by appellant in opposition to the respondents' petition.

The facts, as alleged in the respondents' petition, were as follows. In November 1987 the respondents went with friends to visit an orphanage in Tijuana, Mexico, where they met the minors. At that time Diana was six years old and Brenda was five. The respondents were told by the nuns at the orphanage that the parents of the minors had been killed in a car accident.

The respondents began to visit the minors several times a week, and in December 1987 they attempted to set up a meeting with the uncle of the children to discuss adoption. Instead they were met by appellant who claimed to be the minors' mother. The respondents asked appellant whether they could adopt the children. Appellant told the respondents that they could take the children for a month or longer but that she would not agree to adoption. The respondents told appellant they were not interested in that kind of arrangement.

In May 1988 the respondents received a telephone call from one of the nuns at the orphanage who said that appellant was trying to reach them. They drove to Tijuana on May 8 to meet with appellant who told them that she wanted the respondents to take the children because she could not handle the responsibility and she could not give them the things that they needed. According to the respondents appellant insisted that the respondents take the children right then, and she told the children that they were going to live with the respondents forever. Appellant took the respondents to where she was living and gave them all the children's belongings, including birth certificates, vaccination records and records from the orphanage.

The respondents took the children home and took them for a medical checkup, enrolled them in school, bought furniture, toys and clothes for them, and taught them English. The respondents reported that the children adjusted well, but that they had nightmares about having seen appellant being beaten up by her brother. The children also told the respondents that appellant had put the children in a closet while she had sex with various men.

Appellant telephoned the respondents' house in July 1988 but the children were not home at the time and appellant did not call back. Appellant called in August 1988 asking to see the children, but when the respondents took the children to meet her she did not show up. In September 1988 appellant turned up at the respondents' home and told the respondents that she was angry that she had not been able to see the children, and she took the children with her. When the respondents contacted her the next day she told the respondents that she was taking the children to Guadalajara. In October 1988, after the respondents had located and visited the children several times in Tijuana, appellant allowed them to take the children for a week to celebrate Halloween.

During November the respondents continued to visit the children several times a week but ultimately decided that it would be easier on the children to let them go. After about five days the respondents received a call from the woman who was caring for the children in Tijuana saying that appellant had gone to the United States and had instructed the woman to contact the respondents to come and get the children. The woman told the respondents that the children would sit outside by the gate and wait for the respondents to come pick them up, and that the children told her that they could always count on the respondents. The respondents eventually did collect the children.

After about two weeks appellant contacted the respondents; the respondents told appellant they could no longer be involved in this situation and

they took the children and their belongings to appellant. Near the end of January 1989 the respondents received a telephone call from Brenda, who had just turned seven. Appellant agreed to let the respondents see the girls, and then agreed to let the respondents keep the girls for the rest of the school year. Attached to the respondents' declaration was a letter dated January 7, 1992, from an elementary school principal in Cathedral City stating that both girls had been enrolled in the school continuously from February 8, 1989. Respondent Jose R. took the children every weekend to see appellant who was then living in Pomona.

In May 1989 the respondents told appellant that they did not want to be babysitters for the children any more and that they would like to adopt them. Appellant was afraid that if the respondents adopted the girls they would not let her see them any more. The respondents assured her that they would put it in writing that she could visit the girls.

The minors lived with the respondents, with periodic visits to appellant, until December 25, 1991, at which time appellant took the children for what was supposed to be several days. On December 28, 1991, appellant refused to let the respondents see the children and told the respondents she would never let them see the children again. On January 22, 1992, not having seen the children since December 25, the respondents filed their petitions for temporary and permanent guardianship of the children.

In her closing argument and points and authorities filed with the court April 1, 1993, appellant challenged the allegations of the petition and contended instead that the children had originally been abducted by the respondents and brought to the United States and kept from appellant in spite of her objections. Appellant challenged the respondents' claim of how they obtained the children's birth certificates and health and other documents, stating that they got them from the orphanage rather than from appellant. In support of her position appellant cited conflicting testimony which had been presented at trial by the nun from the orphanage as well as from the parties.

Appellant claimed that, in May of 1988, after having convinced her that the children were to stay for only a short weekend visit, the respondents had taken the children illegally across the international border and had kept them in California for over three months. When the respondents refused to return the children to her she was forced to come to the United States illegally to recover the children from the respondents. Appellant noted that the respondents admitted that appellant had told them that she did not want to give up her children and that she wanted to keep the children with her.

Appellant challenged the respondents' statements that in December 1988 they had been contacted by the babysitter of the children to come pick up the

children and take them to the United States where appellant had already gone. Appellant claimed instead that she had gone to pick up the children after work and discovered that they had been taken by the respondents without her permission. Appellant again cited the contradictory testimony from the babysitter and the respondents as undermining the credibility of the respondents on this issue.

Appellant disputed the explanation given by the respondents for her decision to leave the children with the respondents in early 1989. She contended that the respondents had subjected her to threats that if she did not cooperate she would never get to see the children. The respondents testified that appellant had agreed to let them care for the children and that she would have visitation with them. Appellant apparently testified that she was intimidated and threatened by the respondents with the police and immigration authorities until she allowed the children to go with the respondents.

Appellant apparently also introduced testimony by children other than Diana and Brenda who supported appellant's claims that she had an affectionate relationship with her children and also supported appellant's version of how the children were taken from her. Appellant's argument also referred to a search of her room allegedly made by the respondents in an attempt to find drugs or other items which would reflect badly on appellant, but no such allegations were made in the petition or found by the trial court in the ruling now before us in this appeal.

Finally, appellant alleged a subtle "brainwashing" by the respondents which has alienated the children from her.

At the end of the hearing the trial court granted the respondents' petition for appointment as guardians. In its statement of decision the court ruled, in relevant part, as follows:

"The court finds that:

"At the time of commencement of these proceedings the minor children, Deana and Brenda, were residents and domiciliaries of the County of Riverside, State of California;

". . . . . . . . . . . . . . . . . . . . . . . .

"The court finds that the appointment of a guardian is both necessary and convenient [Prob.C. § 1514(a)];

"[Respondents] are persons in whose home the minors have resided for a substantial period of time and the [respondents] have provided and continue

to provide a wholesome and stable environment for the children [CC § 4600; Prob.C § 1514(b)];

"The awarding of custody of the minors to [appellant] would be detrimental to the children and the award to a nonparent is required to serve the best interests of the children [CC § 4600(c)];

"The awarding of custody of the minors to [respondents] would serve the best interests of the children [CC § 4600. . . .]"

The court went on to find that each of the minors was of sufficient age and capacity to form an intelligent preference which was given due weight by the court in making its decision. The court found that the minors objected to being returned to appellant and to Mexico, and that there was grave risk to the children from both physical and psychological harm.

The statement of decision continued:

"The court finds that the minor children were not abducted by [respondents] in Mexico;

"The court finds that the minor children were brought to the United States with the knowledge and consent of [appellant];

"The court finds that it is not true that [respondents] have detained, concealed, taken or enticed the minor children away with the intent to deprive [appellant] of the right to custody;

"The court finds that the minor children have not been 'brain washed' by [respondents];

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"The standard and burden of proof used by the court in determining this matter is that of 'preponderance of the evidence.' "

At this point the court included a footnote citing, as the basis for the choice of standard of proof applied in the case, a reference to 1 Johnson and House, California Conservatorships and Guardianships (1991) section 7.58, page 368. That authority begins with the statement that "Guardianship matters shall be heard and determined according to the rules of practice in civil actions. Prob C § 1000." The reference continues with a cite to a decision applying the "clear and convincing" standard in conservatorship cases and concludes: "There is no comparable case in the guardianship area. Unless [the conservatorship case] is extended to apply to guardianships, the standard of a 'preponderance of the evidence' should apply. Evid C § 115. . . ."

The court concluded that visitation with appellant would not be detrimental to the minors and ordered that appellant was to have supervised visitation with the minors one day per month as well as open telephone access to them. The court further ordered that the minors were not to be removed from Riverside County. The formal order appointing the respondents as guardians was filed, and appellant filed this appeal.

## Discussion

■ The only issue raised by appellant in this appeal is whether the trial court used the correct standard of proof in determining that the evidence supported grant of the guardianship petition.[1]

■ Evidence Code section 115 provides, in relevant part: " 'Burden of proof' means the obligation of a party to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact or the court. . . . [¶] Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence."

"The burden of proof 'otherwise provided by law' includes decisional law," and is not limited to the burden established by statute. (*Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 619 [165 Cal.Rptr. 217].) Thus, although there is a presumption under the Evidence Code that proof by a preponderance of the evidence will be sufficient, other considerations may alter the standard of proof required if other significant interests are at stake.

"In *Conservatorship of Sanderson, supra,* the court required "clear and convincing" evidence to support appointment of a conservator under the Probate Code reasoning that there is a "potential for deprivation of liberty under probate conservatorship," and that there is a "stigma" which "attaches to a person who has been determined to be unable to feed, clothe, [or] house himself or take care of his financial resources." (106 Cal.App.3d at p. 620.)

■ In considering the issue before us we first look at the statutory scheme under which guardians are appointed. The Probate Code sets forth

---

[1]We note in passing that, contrary to appellant's assertions, the trial court made no determination in this proceeding that the evidence presented by the respondents was *not* clear and convincing. The court determined only that the respondents had established by a preponderance of the evidence that the showing made by the respondents supported the grant of the guardianship petition.

Since the question of whether the evidence was clear and convincing was, in the court's view, not before it at that time, the court made no finding on whether the evidence was sufficient to meet that standard. Thus, a reversal by this court would not defeat the respondents' petition but would instead return the matter to the trial court for a new hearing.

the procedures for filing a petition for appointment of a guardian, including nomination of a guardian, the requirements of notice of a hearing, and an investigation and report by a court-designated officer. (Prob. Code, § 1500 et seq.)

At the time of the hearing in 1992, Probate Code section 1514 stated, in subdivisions (a) and (b), that "(a) Upon hearing of the petition, if it appears necessary or convenient, the court may appoint a guardian of the person or estate of the proposed ward or both. [¶] (b) In appointing a guardian of the person, the court is governed by the provisions of Section 4600 of the Civil Code, relating to custody of a minor."

Civil Code former section 4600[2] applied not only to guardianship proceedings but to all proceedings involving child custody. "There can be no question of the desirability of a uniform rule; the Legislature's specification that section 4600 applies to 'any proceeding where there is at issue the custody of a minor child' demonstrates that section 4600 was enacted to fulfill that objective." (*In re B. G.* (1974) 11 Cal.3d 679, 696 [114 Cal.Rptr. 444, 523 P.2d 244], fn. omitted.)

Civil Code section 4600 states an order of preference for the award of custody, giving preference to both parents jointly or to either parent. (Civ. Code, former § 4600, subd. (b)(1).) Preference is then given "to the person or persons in whose home the child has been living in a wholesome and stable environment." (*Id.*, subd. (b)(2).) The section goes on to provide that "Before the court makes any order awarding custody to a person or persons other than a parent, without the consent of the parents, it shall make a finding that an award of custody to a parent would be detrimental to the child and the award to a nonparent is required to serve the best interests of the child. . . ." (*Id.*, subd. (c).)

In *In re B. G., supra,* 11 Cal.3d 679, the California Supreme Court construed for the first time the changes which were brought about by enactment of the Family Law Act (Civ. Code, § 4000 et seq.) in 1969. One major change from prior law recognized by the court in *In re B. G.* was that under Civil Code section 4600, the court was no longer required to find that a parent was unfit to care for a child before it could award custody to a nonparent. "In summary, the parental preference doctrine, as it existed before the enactment of the Family Law Act, embodied both a requirement that a custody order in favor of a nonparent rest upon a finding of parental

[2]Effective January 1, 1994, the substance of Civil Code section 4600 has been transferred to section 3041 of the new Family Code. In this opinion we will refer to the code sections as they were at the time they were before the trial court in 1992.

unfitness, and the limitation that such an order would be made only in extreme cases. The enactment of section 4600 changes the former principle, and focuses attention not on the unfitness of the parent but the detriment to the child. [Citation.]" (11 Cal.3d at p. 698.)

In *In re B. G.*, *supra*, 11 Cal.3d 679, the court held that, although an award of custody to a nonparent under Civil Code section 4600 does not require a finding of parental unfitness, such a custody award "must be supported by an express finding that parental custody would be detrimental to the child and that finding must be supported by evidence showing that parental custody would actually harm the child." (11 Cal.3d at p. 683.) Since no such finding had been made in that case the court remanded the cause to the trial court for further proceedings, but did not specify the standard of proof to be applied on remand.

The question of what burden of proof is to be applied in a guardianship proceeding was recognized as an issue by the court in *Guardianship of Phillip B.* (1983) 139 Cal.App.3d 407 [188 Cal.Rptr. 781]. Under facts analogous to those now before us, the court in *Phillip B.* granted a guardianship petition filed by nonparents over the objection of the parents of a boy born with Down's syndrome who had been institutionalized by his parents and subsequently befriended by the petitioners. The appellate court was asked to review the sufficiency of the evidence supporting the trial court's finding that retention of custody by the parents would have been detrimental to the minor. (*Id.*, at p. 421.) The appellate court upheld the finding, noting that "In making the critical finding, the trial court correctly applied the 'clear and convincing' standard of proof necessary to protect the fundamental rights of parents in all cases involving a nonparent's bid for custody. [Citations.]" (*Ibid.*) Although the standard was cited with approval, review of the standard was not strictly necessary to the decision since the court was not faced with the question now before us of whether a lower standard would have been sufficient to support the trial court's finding.

The recent California Supreme Court decision in *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 256 [19 Cal.Rptr.2d 698, 851 P.2d 1307], throws light on the appropriate standard for a finding of detriment in a slightly different context. The majority there held that a parent's due process rights were not violated by a dependency statute which permitted the court to set a hearing to determine a permanent plan for the minor following a finding, based only on a preponderance of the evidence, that return of the minor to the parent's custody would create a substantial risk of detriment to the minor. (See Welf. & Inst. Code, § 366.22, subd. (a).)

Applying the analysis outlined by the United States Supreme Court in *Santosky v. Kramer* (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388],

the court in *Cynthia D.* evaluated the three factors identified there: the private interests affected; the risk of error; and the governmental interest supporting the procedure.

In *Cynthia D.* v. *Superior Court, supra,* 5 Cal.4th 242, the court acknowledged the importance of the private interest involved, i.e., the fundamental right to parent, but concluded that in the case before it there had already been numerous determinations of parental inadequacy and "At this point the interests of the parent and child have diverged, and the child's interest must be given more weight." (*Id.,* at p. 254.) In the present case there have been no judicial determinations of parental unfitness. However, the record is undisputed that the minors had resided with the proposed guardians for almost three years at the time of the petition, with visitation to appellant; appellant's interest in her fundamental right to parent had been somewhat compromised by her own willingness to allow that arrangement to continue. Like the court in *Cynthia D.* we have concluded that, given the circumstances of the case, the interests of the minor children were entitled to great weight once their interests had diverged from those of appellant.

Of primary importance in the present case, in our view, is the second factor identified in *Santosky* v. *Kramer, supra,* 455 U.S. 745: the risk of error in the chosen procedure. In *Cynthia D.,* as in most of the cases in which child custody is at issue, the consequences of the procedure are drastic in that they ultimately result in termination of the parental relationship. In *Cynthia D.* the court concluded that the procedures which had preceded the setting of the permanency plan hearing had provided sufficient safeguards to minimize the likelihood of error at that point, and the fact that California had provided representation for the parents up until the termination of parental rights provided "a much more level playing field" than had existed in New York in *Santosky* v. *Kramer, supra,* 455 U.S. 745. (5 Cal.4th at pp. 254-255.)

In the guardianship context the consequence of error is substantially less dire. Although the responsibility for making decisions for the minors is transferred to someone other than the parent, there is no termination of parental rights. Moreover, Probate Code section 1601 provides a mechanism for terminating the guardianship: "Upon petition of the guardian, a parent, or the ward, the court may make an order terminating the guardianship if the court determines that it is no longer necessary that the ward have a guardian or that it is in the ward's best interest to terminate the guardianship. . . ." The order now on appeal directed that appellant have visitation with the minors so she is not faced with actual loss of contact with them. All these circumstances combine to reduce the risk of harm that might follow from an erroneous ruling by the court, and thus to reduce the quantum of evidence which should be required to support the court's decision.

The final factor cited in *Cynthia D.* was "the governmental interest supporting the procedure—the state's *parens patriae* interest in preserving and promoting the welfare of the child, and the state's fiscal and administrative interest in reducing the cost and burden of such proceedings." (5 Cal.4th at p. 255.)

As we have discussed above, Civil Code section 4600, requires a finding that award of custody to a parent would be detrimental to the child and that the award to a nonparent is necessary to serve the best interests of the child. Thus, that section already serves the governmental interest at stake by focusing on the welfare of the child. There is no compelling reason that such a finding must be supported by more than a preponderance of the evidence because the finding itself requires an affirmative finding of detriment; in the absence of such a finding custody remains with the parent. Even at the lower standard of proof the evidence must be sufficient to overcome the presumption that award of custody to a parent is preferable. In our view, the governmental interest is sufficiently served by a showing based on a preponderance of the evidence.

### Disposition

The order granting the guardianship petition is affirmed. Each party to bear its own costs on appeal.

McKinster J., and McDaniel J.,* concurred.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, senior judge status (Gov. Code, § 75028.1), sitting under assignment by the Chairperson of the Judicial Council.