Filed 4/8/22  Conservatorship of Ryan M. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| Conservatorship of RYAN M. | |
| RONALD M., <br><br> Petitioner and Respondent, <br><br> v. <br><br> RYAN M., <br><br> Objector and Appellant. | E072813 <br><br> (Super.Ct.No. MCP1100783) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County. Sunshine S. Sykes, Judge. Affirmed.

Brown White & Osborn, Mark J. Andrew Flory, and Jack B. Osborn, for Objector and Appellant.

Newmeyer & Dillion, Charles S. Krolikowski, and Jason M. Caruso, for Petitioner and Respondent.

1

Conservatee and appellant Ryan M. is a disabled adult who has been in a limited conservatorship over his person since he was 18 years old. He has speech and cognitive impairments that limit his ability to answer questions and express his needs and desires. In the fall of 2015, shortly after Ryan was married, his husband, Sean S., became his conservator.

Six months later, respondent—Ryan's twin brother, Ronald M.—petitioned to remove Sean under Probate Code section 2650 for being unable to faithfully perform his duties as conservator. After a thirteen-day bench trial that included expert testimony under Evidence Code section 730, the judge granted the petition and removed Sean based on findings he was isolating and abusing Ryan and was unable to occupy the roles of spouse and conservator without creating a conflict of interest.

Ryan[1] challenges this ruling on appeal, arguing the judge removed Sean for an improper reason and applied the wrong standard of proof in doing so. We conclude these arguments lack merit and affirm.

# I

## FACTS

Ryan is 28 years old. He has cerebral palsy and epilepsy, as well as developmental impairments that affect his speech and cognition. The consensus of the various medical and psychological professionals who have assessed him over the years is that he has the

---

[1] Ryan is represented on appeal by the same attorneys whom Sean hired to represent him during trial—Mark Flory and Jack Osborn from the law firm of Brown White & Osborn LLP.

mental capacity of a five to six year old. He requires assistance with daily tasks like dressing and bathing and with administering the medications he takes to manage his condition.

Ryan also has two sides of family who have long been fighting over who should be able to see him and who has his best interests at heart. On one side is his adoptive family. When Ryan was a young child, he was removed from his parents' custody and placed in the care of Michelle M., who runs a foster care facility for medically fragile children out of her home and who later adopted Ryan. On the other side is his biological mother's family, which includes his twin brother, Ronald, his grandmother, and his aunt, Monica. According to these family members, as Ryan was growing up, Michelle thwarted their efforts to be part of his life, and Sean continued the trend once he became conservator.

Ryan met Sean in 2011 when he was 17 and Sean was 35. At the time, Ryan was living at the home of his adoptive mother, Michelle. A few years later, in 2014, Sean and Ryan married, and Ryan moved in with Sean, who lives with his parents in Romoland. Sean is a truck driver and when he goes on long-distance jobs he either brings Ryan with him or leaves him home in the care of his parents.

Shortly after the wedding, Ryan filed a petition to remove his current conservators—Michelle and her daughter—and appoint Sean as his conservator. In September 2015, the co-conservators resigned, and the following month the court appointed Sean as Ryan's conservator. Under the terms of the conservatorship, Sean was

granted the right to set Ryan's residence, give or withhold medical consent, and make decisions about Ryan's education, but Ryan retained the right to marry or enter a domestic partnership and to control his own social and sexual contacts and relationships.

About six months into that arrangement, in March 2016, Ronald petitioned to remove Sean and appoint himself and Monica as conservators. The petition alleged Sean was (a) isolating Ryan by prohibiting him from seeing his biological family and threatening to punish him for wanting to spend time with them; (b) keeping Ryan in a violent and disruptive living environment; and (c) emotionally abusing Ryan. The petition also alleged that Sean was forcing Ryan to remain in the marriage despite the fact he lacked the capacity to marry Sean in the first place and didn't want to remain married.

In response to these allegations, court-appointed investigators and social workers visited the parties involved and submitted reports containing their assessments. At an in-home visit in June 2016, Sean's mother told a probate investigator she was afraid to be alone with Ryan because he had assaulted her on multiple occasions. She said she didn't object to the appointment of a public guardian for Ryan and just wanted the "ordeal over."

At an in-home visit in June 2016, a public guardian investigator learned that Ryan had recently been placed on an involuntary psychiatric hold after the Sean's parents called the police on him for hitting Sean's mother. The investigator also learned that, as a result of his marriage to Sean, Ryan stopped receiving supplemental security income or SSI benefits. During an interview with Sean's parents, the investigator observed their

4

"knowledge of the needs of persons with intellectual disabilities were limited." During an in-home visit with Ronald and Monica at Monica's house, the investigator watched the video of Ryan and Sean's wedding ceremony. She found it "evident that Ryan had no comprehension of the marriage ceremony." During the video Ryan asked, "What is this Sean?" when he was asked to put the ring on Sean's finger, and Sean replied, "You are getting married to me." At two different points during the ceremony, Ryan made it clear he thought he was at a baptism and Sean told him, "This is not a baptism. This is a wedding."

In her report filed with the court, the investigator concluded Ryan lacked the capacity to marry and the ability to resist undue influence. She found it "concern[ing] that during the course of Sean's conservatorship . . . Ryan was left without his own income, no health insurance, has increasing episodes of tantrums, violent acting out, and flip-flopping his acceptance or denial of people in his life. Ryan currently spends weeks at a time on a long-distance truck driver schedule. He is not enrolled in school, provided optimum health care services, or activities compelling him to academic growth." The investigator recommended appointing Monica or the public guardian as Ryan's conservator.

In September 2017, when the probate investigator asked Ryan about his marriage to Sean, Ryan said he loves his husband because "he takes me to Disneyland." That same month, another public guardian investigator visited the home and spoke with Sean and his mother. Sean's mother said she had recently tried to kill herself because Ryan's assaults

on her had made her depressed. She described her son's role in the relationship as "a father protecting [his] son." She also said Ryan was manipulative and always demanding they buy things for him. In her report filed with the court, the investigator concluded Sean "may be inadequate to address the overall needs presented by Ryan."

The following month, Ryan was placed on another involuntary psychiatric hold for once again assaulting Sean's mother. After that incident, the mother told the probate investigator Perez she was scared of Ryan and wanted him out of her home.

In February 2018, a social worker for Adult Protective Services (APS) interviewed Ryan at his home. She observed that Ryan seemed nervous or scared and didn't know his own age. He responded "don't ask me that" when Madrid asked him what marriage means. Sean told the social worker his sex life with Ryan is limited because he didn't want to make Ryan uncomfortable.

Trial began in the courtroom of Riverside County Superior Court Judge Sunshine Sykes on February 28, 2018. During his testimony, Sean admitted he and Ryan had been in violent altercations before and that Ryan had been violent with his mother on multiple occasions. He acknowledged that Ryan had been taken to "ETS" (emergency treatment services) for involuntary psychiatric holds on three separate occasions since he had become conservator. Despite knowing Ryan did not like ETS, he admitted he had, on occasion, threatened to send Ryan there as a form of punishment when he was misbehaving.

Sean made several other admissions on the stand. He admitted that he would take his ring off and threaten divorce when Ryan misbehaved; that he would hang up the phone when Ryan was talking to his biological family; that he wouldn't let Ryan see his biological family as another form of punishment; that his mother had cut her wrists in front of Ryan in an attempt to commit suicide; and that, during his first 10 months as conservator, he did not enroll Ryan in any type of school, therapy, or other services and did not take him to the dentist.

Due to his speech and intellectual impairments, most of Ryan's deposition and testimony was elicited in the form of questions with yes or no answers and the answers were often inconsistent. Nevertheless, he agreed, during his deposition, that he did not want to live with Sean's parents, did not want to be married to Sean (and only wanted to be friends), and did not want Sean to be his conservator.

At trial, Ryan said Sean had told him to scream at his deposition and say bad things about Ronald and his aunt. He said Sean's mother had cut her wrists in front of him, and he did not want to live with her.

Ryan also confirmed various forms of punishment Sean used. Sean would tell him to "follow the rules or ETS," would take his phone away if he tried to call his brother or aunt, and would yell at him and threaten to divorce him if he saw his brother. Ryan said he did not like going to ETS because his arm had been broken there by a "big guy." Ryan said the police had come to his house after he punched Sean. He agreed he only wanted to be friends with Sean and wanted his adoptive uncle to be his conservator. Ryan had told

7

interviewers on various occasions that he liked going to his uncle's house because he had a pool and they could play video games.

Sean's father testified he was concerned for his wife's safety around Ryan because he had hit her several times, necessitating professional intervention and involuntary psychiatric holds. He also said Ryan would go on "rage[s]" and that he had seen Ryan hit Sean, too.

Monica, Ryan's aunt, testified Sean refused to let Ryan see her side of the family despite the fact that, as far as she could tell, Ryan wanted to spend time with them. She said Ryan would tell her he loved and missed her and would leave voice messages saying he wanted to see her and Ronald. After Sean became conservator, he had prohibited phone contact with her side of the family and would hang up the phone if he caught Ryan talking to them. She finally saw Ryan at an informal meeting between the parties and their counsel in May 2016. She said Ryan had hugged her and told her he was afraid of Sean and didn't want to leave with him.

The first public guardian investigator to visit Ryan's home testified that she believed Sean had been neglecting Ryan's educational opportunities and attempting to coach and influence Ryan during interviews. The second public guardian investigator testified Sean was evasive and uncooperative during her investigation. She believed Sean was an inadequate conservator for Ryan and was unable to meet his special needs.

Ryan's caretaker at basic operational training testified Ryan would arrive at his sessions dirty, unkempt, and with body odors that suggested poor hygiene. The basic

operational training supervisor also testified Ryan arrived at sessions disheveled and unwashed. The supervisor also said Sean restricted Ryan's biological family members from visiting despite the fact that visits were common and encouraged.

Psychotherapist Elizabeth Rivas testified as an expert on domestic violence and abuse. Having reviewed Sean's and Ryan's deposition testimony, the investigative reports and other court documents, she concluded Sean was emotionally abusing, isolating, and coaching Ryan, and that Ryan's disabilities made him particularly vulnerable to such conduct. She also believed Ryan's physical aggression towards Sean and Sean's mother was a reaction to the abuse and manipulation.

After both sides rested and submitted closing argument briefs, the judge reopened evidence on her own motion and ordered an independent expert evaluation under Evidence Code section 730 to assess whether Ryan had the capacity to marry (both at the time of his wedding and presently); what would be the most appropriate placement for him; and whether it was necessary to revisit the allocation of powers between the conservator and conservatee. The judge appointed licensed psychologist Dr. Gary Freedman-Harvey to conduct the evaluation and submit a report.

After reviewing the trial evidence and evaluating Ryan over two approximately 90-minute sessions, Dr. Freedman-Harvey concluded in his report that Ryan has, at all times, lacked the capacity to marry, that Sean was not an appropriate conservator, that Ryan should be placed in a neutral and therapeutic living environment, and that the court should consider temporarily limiting his right to marry and control his social and sexual

9

relationships. Dr. Freedman-Harvey agreed with previous assessments placing Ryan's cognitive capacity at around the kindergarten level. He said Ryan "appeared to have been coached" and "cannot demonstrate reliable understanding of most concepts other than rote repetition of the phrases taught to him." He found Ryan could not comprehend abstract concepts like love or marriage but could learn concrete rules (if-then logic) and appears to have done so with regard to his marriage. When he asked Ryan if he had wanted to get married, Ryan responded, "We made a deal. That if I get married, I'd have a cell phone." When asked who made the deal, Ryan said, "It was my mom . . . If I got married" then he pointed to his cell phone.

At trial, Dr. Freedman-Harvey expressed several concerns about Sean's care of Ryan and the conflict of interest he believed had arisen as a result of his dual roles of conservator and spouse. Like investigator the first public guardian investigator, Dr. Freedman-Harvey had reviewed the wedding video and concluded Ryan did not know what type of ceremony he was attending or his role in it. Dr. Freedman-Harvey found it concerning that he could hear in the video female voices seeming to coach Ryan, telling him things like, "You can do it." He believed Sean's threats to divorce and abandon Ryan if he did not behave only served to confuse Ryan because he lacked the capacity to know whether Sean was speaking to him as his husband or as his conservator. In his opinion, Sean was isolating and exerting undue influence over Ryan, and restricting Ryan from seeing his biological family did not serve his best interests.

On May 17, 2019, the trial judge granted the petition to remove Sean as conservator, explaining the bases for her decision in a written ruling. She found Sean was "unable to suitably perform the duties of [] conservator" because the "lines between spouse and conservator have been blurred" to the point Sean had a conflict of interest. She found Sean had engaged in "numerous instances of abusive behavior," used inappropriate means of punishment, isolated and exerted undue influence over Ryan, and kept him in a "volatile home." She identified two examples of how Sean's behavior as Ryan's spouse was adverse to the conservatorship. "Based upon all of the evidence, including the wedding video, it appears that Ryan does not have the mental capacity to understand what a marriage is and therefore does not have the capacity to understand consent to be and remain married. That in and of itself places him in a vulnerable position as Sean is not only his spouse, but his conservator. Ryan expressed at deposition that he no longer wanted to be married to Sean, but wanted to be friends. *Ryan retains the right under the conservatorship to make that decision, but practically speaking would have to rely upon Sean in the role as his conservator to make that happen*." (Italics added.) "Equally, it is clear that continuing to live in the [] home is detrimental to Ryan. . . . With the conservator hat on it would be in the best interest of Ryan for Sean to move [him] from the residence, but with the spouse hat on it may be difficult to do. Hence another conflict. A conflict that at present causes grave concern for the well-being of Ryan."

The judge appointed the public guardian to serve as Ryan's temporary conservator. She ordered the public guardian to remove Ryan from Sean's home and

11

place him in the "least restrictive suitable environment in consultation with the Inland Regional Center." She also ordered that Ryan be allowed visits with Sean, his adoptive family, and his biological family in a therapeutic setting.

## II

## ANALYSIS

A. *General Legal Principles*

Under Probate Code section 2650, a conservator may be removed for several reasons, including the conservator's "failure to perform duties or incapacity to perform duties suitably" and the conservator having an adverse interest that creates an "unreasonable risk" they will fail to perform their duties faithfully. (Prob. Code, § 2650, unlabeled statutory citations refer to this code.) In addition, section 2650 allows for removal "[i]n any other case in which the court in its discretion determines that removal is in the best interests of the . . . conservatee." (§ 2650, subd. (j).)

We review an order removing a conservator for cause under section 2650 for abuse of discretion. (*Guardianship of Davis* (1967) 253 Cal.App.2d 754, 761 [whether there is sufficient cause to remove a guardian or conservator "is a question of fact to be determined in the broad discretion of the trial judge, whose determination will not be disturbed except upon a showing of manifest abuse of discretion"].) We will not find an abuse of discretion unless "under all the evidence, viewed most favorably in support of the trial court's action, no judge could have reasonably reached the challenged result." (*Conservatorship of Scharles* (1991) 233 Cal.App.3d 1334, 1340.) "[A] trial court's

exercise of discretion will not be disturbed unless the record establishes it exceeded the bounds of reason or contravened the uncontradicted evidence [citation], failed to follow proper procedure in reaching its decision [citation], or applied the wrong legal standard to the determination." (*Ibid*.)

B. *Discussion*

Before we turn to the arguments contained in Ryan's opening brief, we find it necessary to address what the brief does *not* contain: a summary of the facts. The brief's factual background section consists of three pages summarizing the procedural posture of the case and lacks any reference to the facts we summarized above.

This violates the California Rules of Court, which require appellants to provide a summary of the significant facts from the record in their opening briefs, and each factual reference must be supported "by a citation to the volume and page number of the record where the matter appears." (*Id.*, rule 8.204(a)(1)-(2).) We remind Ryan's counsel that an "appellant defaults, if the appellant predicates error only on the part of the record he provides the trial court, *but ignores or does not present to the appellate court portions of the proceedings below which may provide grounds upon which the decision of the trial court could be affirmed.*" (*Osgood v. Landon* (2005) 127 Cal.App.4th 425, 435, italics added.)

This rule derives from the cornerstone of appellate review—that we presume the appealed judgment is correct unless the appellant affirmatively shows the trial court committed reversible error. (Cal. Const., art. VI, § 13; *Dietz v. Meisenheimer & Herron*

13

(2009) 177 Cal.App.4th 771, 799.) Whether intentional or inadvertent on counsel's part, the complete failure to acknowledge any of the evidence that came out during the thirteen-day trial severely impairs our ability to analyze the arguments in the opening brief and is grounds for deeming the arguments forfeited. (E.g., *Landry v. Berryessa Union School Dist.* (1995) 39 Cal.App.4th 691, 699-700.) We will, however, exercise our discretion to overlook this failing and reach the merits of the appeal.

First, the opening brief argues the basis for removal was improper. According to the brief, the judge removed Sean based on her determination that Ryan lacked the capacity to marry, which is a right expressly reserved to Ryan under the conservatorship and not one of the enumerated grounds for removal under section 2650. But Ryan's lack of capacity to marry was not the basis for removal. As the judge's written ruling makes clear, she found two of the grounds for removal specified in section 2650 applied to Sean—he was failing to faithfully perform his duties as conservator and his dual role as Ryan's spouse created a conflict of interest. (§ 2650, subds. (c) & (f).) These findings are amply supported by the record. Though the judge did conclude Ryan lacked the capacity to marry Sean, that conclusion did not form the basis for removal nor did she make any rulings that affected the legal status of the marriage. She expressly stated in her ruling that Ryan retains the right to enter into marriage and choose his social and sexual contacts.

In a somewhat related argument, the opening brief contends the judge improperly expanded the scope of trial by ordering an Evidence Code section 730 evaluation of

14

Ryan's capacity to marry. However, trial judges have broad discretion to determine whether expert opinions are necessary and on which topics. (E.g., *Hulbert v. Cross* (2021) 65 Cal.App.5th 405, 417.) And here, Ryan's capacity to marry had been a contested issue from the start—Ronald's petition alleged Ryan lacked the capacity to marry, and Ryan opposed that allegation, arguing he was able to understand and appreciate the decision. But even if that wasn't the case, after reading the public guardian investigator's report and hearing her testimony regarding the contents of the wedding video, the judge could reasonably conclude that Ryan's capacity to marry was relevant to the ultimate question of whether Sean was faithfully performing his duties as conservator. And in any event, as noted, Ryan's married status remains intact, as do his specific rights under the conservatorship.

Finally, the opening brief argues the standard of proof for removing a conservator under section 2650 should be the same as the one required for the establishment of a conservatorship under section 1801—clear and convincing evidence—and because the trial judge did not apply this heightened standard, we should reverse. We are not persuaded. Section 1801, which governs the establishment of a conservatorship, affects the proposed conservatee's fundamental rights and explicitly states the clear and convincing standard applies. (§ 1801, subd. (e); *Conservatorship of Sanderson* (1980) 106 Cal.App.3d 611, 620.) In contrast, the decision whether to remove a conservator for cause once the conservatorship has already been established does not affect the conservatee's fundamental rights. And, unlike section 1801, section 2650 doesn't specify

15

a standard of proof, which means the default standard of proof for civil provisions—preponderance of the evidence—applies. (See Evid Code, § 115 [unless otherwise provided, the burden of proof in civil cases is preponderance of the evidence]; see also *Masellis v. Law Office of Leslie F. Jensen* (2020) 50 Cal.App.5th 1077, 1083 ["In California civil litigation, a preponderance of the evidence is the default burden of proof"].)

## III

## DISPOSITION

We affirm the judgment. Respondent shall recover his costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH
J.

We concur:

RAMIREZ
P. J.

FIELDS
J.

16