Filed 6/5/13  P. v. Simmons CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H037403 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. E9909752) |
| v. | |
| MARK STEVEN SIMMONS, | |
| Defendant and Appellant. | |

## I. STATEMENT OF THE CASE

Defendant Mark Steven Simmons appeals from an order extending his involuntary commitment as a mentally disordered offender (MDO).  (Pen. Code, §§ 2970, 2972.)[1]  He claims the court erred in failing to advise him of his right to a jury trial, failing to obtain his personal waiver, accepting counsel's jury waiver, and conducting a bench trial.

We affirm the extension order.

---

[1]  All unspecified statutory references are to the Penal Code.

## II.  BACKGROUND AND PROCEDURAL HISTORY[2]

In 1999, defendant was boarding at a house where D., a 14-year old girl, lived with her mother.  One day, as D. was lying in her bed watching television, defendant came in and lay down under the covers next to her.  He was naked except for a bathrobe.  Holding her shoulders, he pressed himself against her back until she felt his penis.  On four or five other occasions, defendant entered D.'s bedroom and did the same thing.  On another occasion, D. was sleeping in her mother's bed and awakened to find defendant next to her, touching her legs and thighs and between her legs.  D. pretended to be asleep.  After five to 10 minutes, defendant got into the bed and continued to touch her for another half hour or more.  She tried to push him off.  He eventually stopped and then began talking as if nothing had happened.  Defendant stopped molesting D. after D. told her aunt, her aunt told her mother, and they called the police.

In March 1999, defendant pleaded no contest to two counts of lewd and lascivious acts on a 14-year-old girl more than 10 years younger than he was.  (§ 288, subd. (c)(1).)  He was 39 at the time.  In May 1999, he was granted probation on condition he have no contact with D.  In November 1999, probation was revoked because defendant had violated that condition.  In December 1999, defendant admitted the violation and was committed to prison for two years and eight months.

In November 2000, defendant was transferred from Folsom State Prison to Atascadero State Hospital (ASH) for treatment of a mentally disordered offender.  In August 2001, defendant was released from ASH to a conditional release program (CONREP) for outpatient treatment.  Within a short time, however, defendant was re-

---

[2]  In his opening brief, defendant relies on the factual and procedural summary in a prior unpublished opinion of this court.  We take judicial notice of our three prior unpublished decisions concerning defendant: *People v. Simmons* (Aug. 25, 2004, H026672) [nonpub. opn.]; *People v. Simmons* (April 26, 2006, H028499) [nonpub. opn.]; *People v. Simmons* (Jan. 31, 2008, H031491) [nonpub. opn.].)  (Evid. Code, § 452, subd. (d).)  We too base our background and procedural summary on these decisions and the record in this case.

hospitalized at Napa State Hospital (NSH) for disobeying CONREP rules and expressing suicidal ideations. In September, he was transferred back to ASH.

In August 2003, the Santa Clara County District Attorney filed a petition to extend defendant's involuntary commitment to ASH beyond the expiration of his parole term based on allegations that defendant posed a danger to others due to a mental condition that was not in remission. (§§ 2962, 2970, 2972.) After a jury trial, the court sustained the petition and extended defendant's commitment from November 2003 to November 2004. On appeal, however, this court reversed the order due to the insufficiency of evidence that defendant's underlying crimes qualified defendant for continued involuntary treatment as an MDO. (*People v. Simmons*, *supra*, H026672.)[3] On remand after a bench trial, the court found that the crimes qualified defendant for continued treatment and reinstated its previous commitment order. On appeal, this court affirmed the order. (*People v. Simmons, supra,* H028499.)

In May 2005 and August of 2006, the People filed petitions to extended defendant's commitment. The two petitions were consolidated, and after a jury trial, the court ordered his commitment extended until November 2007. On appeal, we affirmed that order. (*People v. Simmons, supra,* H031491.)

Apparently, defendant's commitment was extended a number of times after that. Before the last extension expired in November 2011, the district attorney sought another extension until November 2012. On July 29, 2011, defense counsel waived a jury trial. On September 22, 2011, after a bench trial, the court sustained the petition and extended defendant's commitment.

---

[3] The trial was bifurcated. Under the parties' stipulation, the court decided whether defendant's offenses qualified him for continued involuntary treatment as an MDO; and the jury decided whether defendant was currently dangerous due to a mental condition not in remission. In reversing the order and remanding for a retrial, this court released defendant from his stipulation. Apparently, defendant renewed the stipulation.

## III. THE EXTENSION TRIAL

Fouad Saddik, M.D., a staff psychiatrist at NSH, testified as an expert in the diagnosis and treatment of mental disorders and risk assessment. He had been defendant's treating psychiatrist since June 2010. Dr. Saddik opined that defendant suffered from pedophilia. He based this diagnosis on his treatment and evaluation of defendant, defendant's underlying offense, and a previous forensic psychological evaluation prepared by a "Dr. Geca" at NSH who summarized three sexual incidents involving three different girls.[4] Dr. Saddik testified that defendant's pedophilia caused him to have serious difficulty controlling his behavior. He believed that if defendant were free in the community without any supervision, he would he would pose a danger of physical harm to others because it is possible he would reoffend.

Dr. Saddik also found that defendant suffered from major depression and alcohol dependence. Although defendant's depression waxed and waned, it and his alcohol dependence were currently in remission even without medication.

Dr. Saddik noted that defendant denied the diagnosis of pedophilia. He opined that defendant lacked sexual regulation and self-regulation and was not sufficiently aware of the triggers and signs that would help him identify his inappropriate sexual impulses and not act on them. Improving his ability to do so was the primary focus of defendant's

---

[4] On cross-examination, Dr. Saddik acknowledged that the criteria for pedophilia in the standard diagnostic manual includes sexual conduct with a person 13 years old or younger. However, he explained that the age criteria is not a hard and fast limitation on the diagnosis of pedophilia and other factors can render such a diagnosis appropriate even when the victim is older than 13.

Also on cross-examination, Dr. Saddik testified that it was his understanding that Dr. Geca's evaluation was a compilation of information gleaned from other reports and statements defendant had made to others. Dr. Saddik admitted that he did not personally read any documentation concerning the three previous incidents summarized in Dr. Geca's evaluation; nor did he consult with Dr. Geca about the contents of his evaluation. Dr. Saddik said that if the other three incidents never occurred, he would not rule out a diagnosis of pedophilia, but he would have some question about it.

relapse prevention plan. Dr. Saddik considered it important that defendant attend and complete a sex offender group at NSH. Dr. Saddik noted that defendant had been willing to do so, but a system lock-down at NSH had prevented his participation.

Dr. Saddik commended defendant for having started on a relapse prevention plan but found that at present it was not complete because it did not address his depression and substance abuse. Defendant also needed to complete a wellness and recovery plan for all three of his diagnoses. If and when defendant accomplished these tasks, he could be released to CONREP on outpatient status.

Dr. Saddik opined that because defendant's underlying offense occurred when he was depressed, it was important for him to develop plans to identify the warning signs of depression, decompensation, and even suicidal thoughts. Dr. Saddik noted, however, that in the past, defendant had stopped his medication but sought to take it again because his depression had returned. This was a sign that defendant recognized his depression. On the other hand, it revealed that defendant's depression was recurrent, and something that would require continuous monitoring.

Dr. Saddik could not say that defendant's pedophilia was in remission because the environment at NSH contained him and eliminated the contraband that might stimulate him. He also noted that defendant had a history of developing romantic obsessions. He noted that defendant had left inappropriate messages for a rehabilitation technician. Defendant also talked about an obsession with a female disc jockey named Lisa Fox, who had obtained a restraining order against him. Despite it, he sent her a letter, which NSH intercepted. Dr. Saddik explained that these romantic obsessions were cause for concern because they revealed "vague boundaries with females" and could possibly increase the danger from his pedophilia if he became obsessed with a very young girl.

On the positive side, Dr. Saddik noted no reports of behavioral problems, aggressive or assaultive conduct, or sexually inappropriate behavior. Moreover,

5

defendant was "programming," enrolled in college classes, regularly attending church singing in a choir, and had recently applied to be a Universal Life Church minister.

Defendant testified and rejected the diagnosis of pedophilia. He also said he did not know anyone named Dr. Geca and denied that any of the incidents summarized in that doctor's report had ever occurred.

Concerning the commitment offense, defendant said that he knew D. was only 14. However, he said she was not a little girl. He explained that he had been working at a modeling agency and wanted to use her as a model. He described her as a gorgeous, physically developed—"a 34C"—high school cheerleader with long blonde hair that came down to her waist. He treated her like a girlfriend, not a little girl, and loved her. They kissed and snuggled, and he fondled her. He conceded that his conduct might have harmed her a "little bit." However, he felt his conduct had a positive effect in that it broke her habit of flirting with older men online.

Defendant denied that if released he would seek to have a relationship with a child. Defendant said that even in the hospital, contraband alcohol was available. However, he attended NA and AA meetings and had been sober for 21 years. He said that he worked at the hospital and had been cleared to work with dangerous equipment.

Defendant admitted violating probation by having contact with D. He also admitted trying to send a letter to the disc jockey in violation of the restraining order. In that regard, he believed that the hospital staff had pulled one of their "dirty tricks" on him to maintain the income they got from taking care of him. He also felt that to save her job, Lisa Fox had cooperated with other people, who were the ones who wanted the restraining order. He believed that Ms. Fox was scared of him, but he said he still wanted to meet her in person and compare notes without her bosses listening.

Defendant said that if unconditionally released, he would continue his AA meetings. He said he would start to develop his ministry in the Universal Life Church.

6

He would also pursue a career as a radio announcer and recording artist, noting that his major in college was broadcasting.

## IV. MOOTNESS

The extension period of defendant's commitment has expired, and therefore the propriety of the court's order is now moot. Thus, it may not appear necessary to address defendant's claims of error concerning the jury advisement, lack of personal waiver, and bench trial. However, "we review the merits of appeals from timely filed petitions that are rendered technically moot during the pending of the appeal, . . . because the appellant is subject to recertification as an MDO, and the issues are otherwise likely to evade review due to the time constraints of MDO commitments. [Citations.]" (*People v. Merfield* (2007) 147 Cal.App.4th 1071, 1074.)

## V. THE MDO COMMITMENT SCHEME AND EXTENSION PROCEDURE

When persons who have been convicted of a violent crime related to their mental disorders are eligible for release but currently pose a danger of harm to others, the Mentally Disordered Offender Act (the Act) (§ 2960 et seq.) permits their involuntary commitment to a state hospital for treatment until their disorders can be kept in remission. (*In re Qawi* (2004) 32 Cal.4th 1, 9 (*Qawi*); see *Lopez v. Superior Court* (2010) 50 Cal.4th 1055, 1061 (*Lopez*) [the MDO Act has the dual purpose of protecting the public while treating severely mentally ill offenders].)

The Act provides treatment at three stages of commitment: as a condition of parole, in conjunction with the extension of parole, and following release from parole. (*Lopez, supra*, 50 Cal.4th at p. 1061.) "Sections 2970 and 2972 govern the third and final commitment phase, once parole is terminated. If continued treatment is sought, the district attorney must file a petition in the superior court alleging that the individual suffers from a severe mental disorder that is not in remission, and that he or she poses a substantial risk of harm. (§ 2970.)" (*Lopez, supra*, 50 Cal.4th at p. 1063.)

7

Section 2972, subdivision (a) provides, among other things, that when a petition is filed, the court "shall advise the person . . . of the right to a jury trial"; and "the trial shall be by jury unless waived by both the person and the district attorney."[5] (§ 2972.) To obtain an extension, the district attorney must prove, and the trier of fact must find beyond a reasonable doubt, that (1) the person continues to have a severe mental disorder; (2) the person's mental disorder is not in remission or cannot be kept in remission without treatment; and (3) the person continues to represent a substantial danger of physical harm to others. (*Lopez, supra*, 50 Cal.4th at p. 1063; *People v. Beeson* (2002) 99 Cal.App.4th 1393, 1398-1399; § 2972, subds. (c), (e).)

## VI. CONTENTIONS

Defendant contends that if an MDO is competent, then under the Act, the court must conduct a jury trial unless the MDO personally and expressly waives a jury. Thus, he claims that the court erred in failing to give the required advisement and conducting a bench trial without obtaining his personal waiver. He argues the errors violated his right to a jury trial under the Act and under the state and federal due process and equal protection clauses.

Citing *People v. Otis* (1999) 70 Cal.App.4th 1174 (*Otis*) and *People v. Montoya* (2001) 86 Cal.App.4th 825, 829 (*Montoya*) as well as *People v. Masterson* (1994) 8

---

[5] Section 2972, subdivision (a) provides, "(a) The court shall conduct a hearing on the petition under Section 2970 for continued treatment. The court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial. The attorney for the person shall be given a copy of the petition, and any supporting documents. The hearing shall be a civil hearing, however, in order to reduce costs the rules of criminal discovery, as well as civil discovery, shall be applicable. [¶] The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. The trial shall be by jury unless waived by both the person and the district attorney. The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown."

8

Cal.4th 965, 974 (*Masterson*), the Attorney General argues that the Act does not require a personal waiver and in fact gives counsel exclusive control over the jury decision.

## VII. DISCUSSION

Recently, in *People v. Blackburn* (2013) 215 Cal.App.4th 809 [156 Cal.Rptr.3d 106, 112-115] (*Blackburn*), we addressed identical claims.

First, we rejected the defendant's claim that the Act required an MDO's personal waiver. We noted that the claim previously had been rejected in *Otis, supra,* 70 Cal.App.4th 1174 and *Montoya, supra,* 86 Cal.App.4th 825, 829. In doing so, those courts noted that the statutory language did not expressly require a personal waiver; nor did it clearly preclude a waiver by counsel. The courts also declined to infer such a requirement because some MDOs may not be sufficiently competent to determine whether a bench or jury trial is in their best interests. Under those circumstances, the incompetent MDO must act through counsel, and counsel must have authority to waive a jury trial, even over the MDO's objection. (*Otis*, *supra*, 70 Cal.App.4th at p. 1177; *Montoya*, *supra*, 86 Cal.App.4th 830-831; cf. *People v. Powell* (2004) 114 Cal.App.4th 1153, 1157-1159 (*Powell*) [relying on *Otis* to reject a claim that similar language in section 1026.5 required personal jury waiver].)

In *Blackburn*, we agreed with *Otis* and *Montoya*. (*Blackburn, supra*, 215 Cal.App.4th at pp. ___ [156 Cal.Rptr.3d at p. 113].) We further opined that interpreting the statutory language to require a personal waiver resulted in consequences that were illogical and anomalous. (*Ibid*.) We noted that for a variety of reasons, MDOs often do not appear in court until the day of trial. We considered it was illogical to prohibit counsel from waiving the statutory right to a jury trial at the MDO's direction or with the MDO's express consent and instead require the court to order the MDO's presence at some pretrial hearing just to secure a personal waiver because in general counsel can waive a client's more fundamental constitutional right to a jury trial in civil actions. (*Id*. at p. 114; see Cal. Const., art. I, § 16 [right to jury trial]; Code of Civ. Proc, § 631

9

[prescribing types of waiver]; *Zurich General Acc. & Liability Ins. Co. v. Kinsler* (1938) 12 Cal.2d 98, 105 (*Zurich*) [waiver by party or counsel], overruled on other grounds in *Fracasse v. Brent* (1972) 6 Cal.3d 784, 792; *Cadle Co. v. World Wide Hospitality Furniture, Inc.* (2006) 144 Cal.App.4th 504, 510; *Conservatorship of Maldonado* (1985) 173 Cal.App.3d 144, 148; see Code Civ. Proc., § 283, subd. (1) [counsel has authority to bind client in any of the steps of an action].)

We further observed that some MDO may be so delusional or otherwise affected by their mental disorders that they lack the capacity to know what is in their own best interests and make a rational decision. Under such circumstances, an MDO may not be able to knowingly and intelligently waive the right to a jury trial. We opined that "[i]f an MDO is incompetent, and in a particular case counsel believes that a jury waiver is in the MDO's best interests, requiring that MDO's personal waiver would undermine counsel's ability to protect the MDO's interests . . . and mechanically require the court to conduct a jury trial or give the incompetent defendant veto power over counsel's informed determination." (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 114].)

In short, we found that "preventing counsel from waiving a jury at the NGI defendant's direction or with the MDO's consent and preventing counsel from doing so on behalf of an incompetent MDO are anomalous consequences that would flow from interpreting the waiver provision literally and restrictively to require a personal waiver." (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 114]) For that reason, we considered it unreasonable to infer such a restrictive and exclusive legislative intent from the statutory language. (*Ibid.*)

After rejecting the defendant's claim of a personal waiver requirement, we rejected the Attorney General's claim that the Act gave counsel exclusive control. We noted that the Act did not expressly confer exclusive control. Moreover, we pointed out that when read together, the requirements that the court advise the MDO of the right to a

10

jury and conduct jury trial unless waived by "the person" not only imply that MDOs can comprehend the advisement but also contemplate that an MDO can control the jury decision. (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 115].) Indeed, we opined that interpreting the Act to give counsel exclusive control would defeat the purpose of the required jury advisement and render that provision meaningless surplusage. (*Id*. at p. 116.)

We further explained that the Attorney General's reliance on *Masterson, supra,* 8 Cal.4th 965, *Otis, supra,* 70 Cal.App.4th 1174, and *Montoya, supra,* 86 Cal.App.4th 825 was misplaced.

We acknowledged that in *Masterson*, the California Supreme Court recognized counsel's exclusive control over the jury issue in proceedings to determine the competency of a criminal defendant to stand trial. (*Masterson, supra,* 8 Cal.4th at pp. 971, 973.) The court's finding rested on both the specific nature of the competency proceeding, in which the allegedly incompetent defendant plays a lesser role; and on the assumption that a defendant whose competency is in doubt is unable to act in his or her own best interests and must therefore act through counsel. (*Id*. at p. 971.)

We noted that more recently the court in *People v. Barrett* (2012) 54 Cal.4th 1081 (*Barrett*) similarly recognized counsel exclusive control in proceedings under Welfare and Institutions Code § 6500 to involuntarily commit developmentally or intellectually disabled persons who pose a danger to others. (*Id*. at pp. 1104-1105.) There too counsel's exclusive authority derived from the nature of the proceedings. The court explained that the statute applies to persons who have significant cognitive and intellectual deficits that never recede and affect the ability to make basic decisions about the conduct of the proceedings. In other words, it may be assumed that such disabled persons are unable to act in their own best interests and must act through counsel. (*Id*. at pp. 1103-1104.)

11

As we explained in *Blackburn*, *Masterson* and *Barrett* establish that in certain types of commitment proceedings, the defendant's alleged mental state—e.g., incompetency and developmental or intellectual disability—renders the defendant unable to make reasoned decisions concerning whether to have a jury trial. In other words, it is reasonable to categorically assume that such defendants lack the capacity to make a rational choice. "For that reason, they must act through counsel, and counsel has exclusive control over the jury issue." (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 119] .)

We concluded, however, that it was *not* reasonable to similarly assume that all MDOs lack the capacity to make rational decisions about whether to have a jury trial. In this regard, we relied on *Barrett*, where the Supreme Court made that precise point. There, the court distinguished persons who have developmental and intellectual disabilities from persons who suffer from a mental disorder, disease, or defect concerning their capacity to function in a competent manner and, more specifically, to comprehend and control the jury decision. (*Barrett, supra*, 54 Cal.4th at pp. 1108-1109.) The court concluded that unlike all persons with developmental and intellectual disabilities, many mentally ill persons retain the capacity to function in a competent manner, and therefore, their illness does not necessarily imply incompetence or a reduced ability to understand and make decisions about the conduct of the proceedings against them, such as comprehending an advisement and controlling the decision to request or waive a jury trial. (*Ibid*.)

Concerning *Otis* and *Montoya,* both of which involved MDO proceedings, we found them to be consistent with—indeed that they mirrored—the *Masterson-Barrett* rationale for recognizing counsel's exclusive control over the jury issue.[6]

_____

[6] *Otis* dealt with section 2966, subdivision (b) and *Montoya*, as here, dealt with section 2972, subdivision (a), but both sections require the court to advise the MDO of

12

In *Otis*, counsel waived a jury trial. The defendant objected and requested a jury trial, but at the time, he was delusional and said he was being sexually assaulted by invisible police. The trial court denied the request. On appeal the court upheld counsel's waiver. (*Otis*, *supra*, 70 Cal.App.4th at pp. 1175-1176.) In doing so, the court explained that "[s]ection 2966 concerns persons who have been found by the Board of Prison Terms to be mentally disordered. The Legislature must have contemplated that many persons, *such as Otis*, might not be sufficiently competent to determine their own best interests. There is no reason to believe the Legislature intended to leave the decision on whether trial should be before the court or a jury in the hands of such a person." (*Otis, supra*, 70 Cal.App.4th at pp. 1176-1177.)

In *Montoya, supra,* 86 Cal.App.4th 825, counsel waived a jury. Although the defendant did not object, he claimed on appeal that his personal waiver was required. (*Id.* at pp. 828-829.) In concluding otherwise, the court opined that the Legislature could not have intended to require a personal waiver and thereby deny counsel the authority to act on behalf of an incompetent MDO. (*Id.* at pp. 830-831.) In this regard, the court noted that the defendant's mind was not functioning normally, and he had repeatedly and recently demonstrated poor judgment and aberrant behavior. Given the record, the court found "no reason to believe that defendant was capable of making a reasoned decision about the relative benefits of a civil jury trial compared to a civil bench trial." (*Montoya, supra*, 86 Cal.App.4th at p. 831.)

In *Blackburn*, we understood *Otis* and *Montoya* in light of the specific facts and issues in those cases. (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 122]; see *Ginns v. Savage* (1964) 61 Cal.2d 520, 524, fn. 2 ["[l]anguage used in any opinion is of course to be understood in the light of the facts and the issue then before the court"].) Given the similar mental state of the defendants in both, we read both cases "for

the right to a jury trial and conduct a jury trial "unless waived by the person and the district attorney."

the proposition that when an MDO appears to be incapable of determining whether a bench or jury trial is in his or her best interests, the MDO must act through counsel, and counsel has exclusive authority to decide even over the MDO's objection." (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 122].)  Conversely, "[n]either case . . . should be read more broadly to hold that counsel controls the jury issue regardless of whether the MDO is competent to understand the advisement and make a reasoned decision.  This is especially so because neither case addressed the purpose and function of the mandatory jury advisement." (*Ibid.*)

In sum, we concluded in *Blackburn* that the Act did not require an MDO's personal waiver or give counsel exclusive control over the jury decision.  Rather, we held that counsel may waive a jury at the MDO's direction or with the MDO's consent; and when there is cause to doubt the MDO's competence to determine whether a bench or jury trial is in his or her best interests, counsel can make the decision even over the MDO's objection. (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at pp. 123-124].)

Finally, in *Blackburn*, we observed that the propriety of the bench trial turned on the validity of counsel's waiver, which, in turn, hinged on whether the defendant knew he had the right to a jury trial and directed or knowingly consented to counsel's waiver. (*Blackburn, supra*, 215 Cal.App.4th at p. ___ [156 Cal.Rptr.3d at p. 124].)  The same is true in this case.

As defendant correctly notes, the record does not reflect that the court gave the required advisement.  This is understandable. The record also reveals that after being appointed, counsel waived defendant's presence at every hearing until the bench trial. However, it is beyond dispute that counsel was aware of defendant's right to a jury trial. And where, as here, counsel waives an MDO's presence at pretrial hearings, effectively preventing a direct judicial advisement before trial, the court may reasonably expect counsel to discuss all pertinent matters that will arise or that have arisen in pretrial

14

hearings, including the right to a jury trial and whether to have one. Indeed, "[l]ike all lawyers, the court-appointed attorney is obligated to keep her client fully informed about the proceedings at hand, *to advise the client of his rights*, and to vigorously advocate on his behalf. [Citations.] The attorney must also refrain from any act or representation that misleads the court. (Bus. & Prof.Code, § 6068, subd. (d); Rules Prof. Conduct, rule 5–200(B).)" (*In re Conservatorship of John L.* (2010) 48 Cal.4th 131, 151-152, italics added.) Moreover, absent a showing to the contrary, "[a] reviewing court will indulge in a presumption that counsel's performance fell within the wide range of professional competence and that counsel's actions and inactions can be explained as a matter of sound trial strategy." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211; *Conservatorship of Ivey* (1986) 186 Cal.App.3d 1559, 1566; e.g., *Conservatorship of Mary K.* (1991) 234 Cal.App.3d 265, 272 [where no evidence to the contrary, court may presume counsel discussed jury waiver with client before waiving on client's behalf].)

Under the circumstances, and in the absence of evidence to the contrary, we may presume that counsel discussed the jury issue with defendant. Moreover, the record does not suggest that defendant was unaware of his right to a jury trial. As noted, his commitment had been extended numerous times, and he actually had a jury trial on a previous extension.

The record also does not suggest that defendant was unaware that counsel intended to waive a jury and had done so or that counsel acted without defendant's knowledge or consent or that defendant wanted a jury trial and objected (or would have objected) to counsel's waiver. Any such inferences would be pure speculation on our part.[7]

---

[7] If, in fact, defendant was unaware of his right to a jury trial and would have opposed or did oppose counsel's waiver, but the evidence to establish these facts lay outside the record on appeal, defendant had the alternative a remedy of habeas corpus to challenge his commitment on the ground of ineffective assistance of counsel. (See *People v. Gray* (2005) 37 Cal.4th 168, 211 [claims grounded in facts outside the record can be raised by habeas petition]; *In re Bower* (1985) 38 Cal.3d 865, 872.)

15

It is settled that on appeal, the appellant bears the burden to affirmatively establish error and then demonstrate that it resulted in a miscarriage of justice that requires reversal. (*Cucinella v. Weston Biscuit Co.* (1954) 42 Cal.2d 71, 82; *Freeman v. Sullivant* (2011) 192 Cal.App.4th 523, 528; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 105-106; *Thompson v. Thames* (1997) 57 Cal.App.4th 1296, 1308; see 9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 355, p. 409 [presumption of correctness; "error must be affirmatively shown"].)

In short, given the record before us, defendant cannot satisfy his burden to establish that he was unaware of the right to a jury trial before counsel waived a jury or that counsel's waiver was invalid.

Furthermore, before any judgment can be reversed for error under state law, it must appear that the error complained of "has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13; *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 801.) This means that reversal is justified "when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)

With this in mind, we conclude that even if defendant could show that he was unaware of the right to a jury trial and that counsel acted without his knowledge and consent or over his objection, he could not establish prejudice. It is settled that the erroneous denial of a statutory right to a jury trial is subject to harmless-error review under the *Watson* test which, in this context, asks whether it is reasonably probable the result would have been more favorable had there been a jury trial. (*People v. Epps* (2001) 25 Cal.4th 19, 29.)

As noted, Dr. Saddik opined that the diagnosis of pedophilia made it difficult for defendant to self-regulate his sexual impulses. He noted that defendant had acted on his obsessions, had had trouble maintaining appropriate boundaries with women, and had

16

violated probation conditions and restraining orders concerning his victim and a radio host. He further noted that defendant lacked a sufficient awareness of the triggers and signs of inappropriate impulses to be able to prevent acting on those impulses. In this regard, he pointed out that defendant had not completed relapse prevention or wellness and recovery plans.

Defendant, on the other hand, rejected the diagnosis of pedophilia. He denied ongoing interest in having a relationship with young girls, and he denied misconduct with girls other than the victim of his commitment offense. Moreover, he thought of her more as a woman than a young girl. Defendant admitted violating probation and the restraining order. He also admitted wanting to meet the woman radio host to talk about what had happened. Defendant sought unconditional release so he could pursue a ministry and a radio career and continue with AA.

Dr. Saddik's testimony constitutes strong evidence to support the commitment extension order. It is true that his diagnosis of pedophilia was based in part on Dr. Geca's forensic evaluation, that evaluation summarized other incidents, defendant denied those incidents, and Dr. Saddik said he would question his diagnosis if those incidents did not in fact occur. However, these circumstances merely affect the weight to be given Dr. Saddik's overall opinion and conclusion. Moreover, it was entirely reasonable for Dr. Saddik to consider Dr. Geca's evaluation in treating defendant and forming his opinion, and Dr. Saddik did not rule out a diagnosis of pedophilia even if the other incidents did not occur. Furthermore, defendant's comments about his victim, his view of the impact his offense had on her, his violation of the probation condition and restraining order, his desire for unconditional release despite his failure on outpatient status were circumstances that a jury would have to consider in determining his credibility and his denial of the other incidents of misconduct and of his diagnosis of pedophilia.

With these considerations in mind, and assuming that defendant was unaware of his right to a jury trial, we do not find it reasonably probable that defendant would have

17

obtained a more favorable verdict had the court given the required advisement and conducted a jury trial. (*People v. Watson, supra,* 46 Cal.2d at p. 836; e.g., *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1276 [denial of statutory right to MDO trial harmless].)

As noted defendant contends that the failure to advise and conduct a jury trial denied his right to a jury trial under the state and federal due process and equal protection clauses.

## A. Due Process

Defendant asserts that if the Act did not provide the right to a jury trial, he would still have the right under the state and federal constitutional guarantees of due process. He argues that the court's procedure in this case violated this constitutional right. However, since there is a statutory right, defendant's due process claim is based upon an assumption which is contrary to the state of existing law. We will not decide theoretical constitutional questions which are based upon faulty premises. (*People v. Moore* (2011) 51 Cal.4th 1104, 1123 [rejecting equal protection argument based on faulty premise]; *People v. Low* (2010) 49 Cal.4th 372, 393, fn. 11 [due process claim challenging state's actions rejected where argument based upon faulty premise that defendant committed no unlawful act]; *Berardi v. Superior Court* (2008) 160 Cal.App.4th 210, 228 [court will not decide "hypothetical or other questions of constitutional law unnecessary to our disposition of the case"].)

Moreover, we note that in *Montoya, supra,* 86 Cal.App.4th 825, the court rejected the MDO's claim that the federal due process clause guaranteed an MDO the right to a jury trial. " 'Where . . . a State has provided for the *imposition of criminal punishment* in the discretion of the trial jury, it is not correct to say that the defendant's interest in the exercise of that discretion is merely a matter of state procedural law. The defendant in such a case has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion,

[citation], and that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State.' [Citation.] A jury sitting in a civil hearing pursuant to sections 2970 and 2972 does not impose criminal punishment and has no power to determine the extent to which the defendant will be deprived of his liberty. Defendant's jury trial interest thus is, in this case, 'merely a matter of state procedural law' and does not implicate the Fourteenth Amendment. [Citation]." (*Id*. at pp. 831-832, quoting *Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 (*Hicks*); cf. *Powell, supra*, 114 Cal.App.4th at p. 1159 [rejecting NGI's claim that denial of jury trial violated constitutional right to due process].)

Defendant cites *In re Gary W.* (1971) 5 Cal.3d 297, *People v. Feagley* (1975) 14 Cal.3d 338, *People v. Thomas* (1977) 19 Cal.3d 630, and *In re Hop* (1981) 29 Cal.3d 82 for the proposition that due process guarantees the right to a jury trial in commitment cases.

In these cases, the court found that persons facing involuntary commitment under statutory schemes that did *not* provide for a jury trial were similarly situated to persons facing commitment under schemes that provided a jury trial upon request. Thus, under the equal protection clause, the former group is entitled to a request a jury trial unless there is a valid justification for not allowing them to do so. And if there is no such valid justification, the unequal treatment is arbitrary and violates due process. However, none of these cases separately analyzed whether, apart from arbitrarily treating similarly situated persons differently, the due process clause independently guarantees persons subject to civil commitment the right to a jury trial. Accordingly, we find defendant's reliance on them misplaced.

Moreover, although the arbitrary denial of a statutory right may violate the constitutional guarantee of due process, the record here does not establish that the court's failure to advise defendant and failure to conduct a jury trial were arbitrary. Counsel waived defendant's presence at every hearing before trial, and he also waived a jury trial.

19

Again, we do not presume error, and, as noted, because defendant has not shown that counsel's waiver was unauthorized or otherwise invalid, he can no more show a constitutional violation than he could show a statutory violation. Accordingly, we reject defendant's due process claim.

### B. Equal Protection

Defendant asserts that in every scheme permitting the involuntary commitment of a person for mental health purposes, there is a right to a jury trial. He further asserts that an MDO defendant facing an extended commitment is similarly situated to persons facing a commitment under these other schemes. Thus, he claims that in conducting a bench trial here, the court denied him equal protection. Defendant's claim fails because the Act provides defendant with the right to a jury trial, and counsel waived that right. Thus, defendant fails to identify how he was treated differently from how he would have been treated under any of the other commitment schemes.

### VIII. DISPOSITION

The order extending defendant's commitment is affirmed.

 

_____
RUSHING, P.J.

 

I CONCUR:

 

_____
PREMO, J.

20

ELIA, J., Concurring:

I respectfully concur in the judgment on the ground that no reversible error has been shown.  (Cal. Const., art. VI, § 13; *People v. Watson* (1956) 46 Cal.2d 818, 836.) We must presume for purposes of this appeal that appellant's counsel informed appellant that he was entitled to be tried by a jury and counsel waived a jury trial in accordance with appellant's informed consent (see maj. opn., *ante*, pp. 3-4).  (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [all presumptions are indulged to support a lower court judgment or order regarding matters as to which the record is silent; error must be affirmatively shown]; see also *Conservatorship of John L.* (2010) 48 Cal.4th 131, 148 ["When a statutory right in a civil commitment scheme is at issue, the proposed conservatee may waive the right through counsel if no statutory prohibition exists. [Citations.]"], 151-152 [attorney is obligated to keep client fully informed of proceedings, to advise client of his rights, and to refrain from any act or representation that misleads the court].)

Even assuming arguendo that appellant had a constitutional right to a jury trial as a matter of due process, the same presumption applies on appeal.  (See *Denham v. Superior Court*, *supra*, 2 Cal.3d at p. 564; *Conservatorship of John L.*, *supra*, 48 Cal.4th at pp. 151-152.)  To the extent appellant is arguing that he had concomitant due process rights, under either the United States or California Constitution, to a judicial advisement of his right to a jury trial and to personally and expressly waive a jury on the record, his arguments are unpersuasive since he was represented by counsel who presumably advised and consulted with him and there is no constitutional provision explicitly requiring an express, personal waiver of a jury in noncriminal proceedings.  (See Cal. Const., art. I, § 16; cf. Code Civ. Proc., § 631; *People v. Bradford* (1997) 14 Cal.4th 1005, 1052-1053 [in criminal prosecution, no express, personal waiver from a defendant is required for waiver of constitutional right to testify; a trial judge may safely assume that a nontestifying defendant is abiding by his counsel's trial strategy].)

Consequently, it is unnecessary in this case to repeat the majority's conclusions in *People v. Blackburn* (2013) ___ Cal.App.4th ___ [2013 WL 1736497] regarding the exact extent of a counsel's authority to waive a jury for trial on a petition for continued treatment under the Mentally Disordered Offender (MDO) Act. (See Pen. Code, §§ 2970, 2972, subd. (a).) As the U.S. Supreme Court stated: "The duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." (*Mills v. Green* (1895) 159 U.S. 651, 653 [16 S.Ct. 132]; see *Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541.)

_____

ELIA, J.

2